Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob A. Goldberg, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

[Additional counsel on signature block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIEL WEBER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTRACKER INC., DANIEL SHUGAR, DAVID BENNETT, HOWARD WENGER, and CHARLES BOYNTON,<br><br>Defendants. | Case No. 5:24-cv-09467-PCP<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 7

IV. SUBSTANTIVE ALLEGATIONS ..... 10

A. Background ..... 10

B. As a Public Company Defendants Raise Annual Guidance Every Quarter ..... 12

C. Defendants Possess Real Time Information on the Project Delays and Their Impact on Nextracker's Financial Results ..... 14

D. In the Face of Persistent Investor Inquiry Defendants Expressly Downplay the Impact of Delays ..... 25

V. FALSE AND MISLEADING STATEMENTS ..... 32

VI. THE TRUTH EMERGES ..... 39

VII. CLASS ACTION ALLEGATIONS ..... 42

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..... 44

IX. NO SAFE HARBOR ..... 46

X. COUNTS ..... 47

XI. PRAYER FOR RELIEF ..... 54

XII. DEMAND FOR TRIAL BY JURY ..... 54

Lead Plaintiff Ryan Barker ("Plaintiff") and additional named plaintiff Charles Bennett ("Plaintiffs"), by and through their attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffss' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, including, among other things, reviewing the public documents, conference calls, wire and press releases and other announcements of defendants Nextracker, Inc. ("Nextracker" or "Company"), Daniel Shugar ("Shugar"), David Bennett ("Bennett"), Howard Wenger ("Wenger"), Charles Boynton ("Boynton"), and Nicholas "Marco" Miller ("Miller") (together, "Defendants"), Nextracker's United States Securities and Exchange Commission ("SEC") filings, analysts' reports and advisories about the Company, interviews with former employees of the Company, and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities that purchased Nextracker common stock between May 14, 2024 and August 1, 2024, both dates inclusive ("Class Period"), against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act"). Excluded from the class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

2. Senior officers of Nextracker, a provider of equipment and software solutions for utility-scale solar projects, persistently denied that industry-wide headwinds that had caused project delays for competitors were materially impacting the Company's financial results. Rather, Defendants asserted publicly that Company-specific tailwinds overcame those headwinds, fueling the Company's robust growth. Eventually, however, the headwinds strengthened, overcoming the tailwinds of which Defendants had boasted. When Defendants admitted this, acknowledging that project delays had materially slowed Nextracker's growth, the price of Nextracker common stock dropped from $46.83 per share when the market closed on August 1, 2024 to $39.81 per share when the market closed on August 5, 2024, a 15% decline on abnormally high volume over two trading days. During the Class Period, Defendants knowingly or recklessly disseminated materially false and misleading statements about the impact of project delays on Nextracker's financial results.

3. Nextracker, a company incorporated in Delaware and headquartered in Fremont, California, is a supplier of software solutions and products that enable

solar panels to follow the sun's movements across the sky to optimize utility power plant performance.

4. Nextracker completed its initial public offering ("IPO") in February 2023, spinning off from Flex Ltd. ("Flex"), an international electronics manufacturing services and original design manufacturer. In January 2024, Nextracker announced that Flex had completed the spin-off and sale of its remaining interests in the Company.

5. Nextracker's customers include engineering, procurement, and construction firms ("EPCs"), as well as solar project developers and owners. Developers originate projects, select and acquire sites, obtain permits, select contractors, negotiate power offtake agreements, and oversee the building of projects. EPCs design and optimize the system, procure components, build and commission the plant, and operate the plant for a limited time until transfer to a long-term owner. Owners, which are often independent power producers, own and operate the plant, typically as part of a portfolio of similar assets. Owners generate cash flows through the sale of electricity to utilities, wholesale markets, or end users.

6. The solar tracker market increases energy production and improves the levelized cost of energy ("LCOE"), the average cost of electricity generation over the lifetime of an energy asset. Thus, the majority of utility-scale projects installed

today in mature markets use solar traction, and adoption of the technology is growing in developing markets. The United States is the Company's most important and profitable market, generally accounting for more than two thirds of its business.

7. On August 16, 2022, the U.S. government enacted the Inflation Reduction Act of 2022 ("IRA"). The IRA entitled manufacturers that support clean energy in the United States to a tax credit for each clean energy component domestically produced and sold by a manufacturer, and resulted in significant growth in the solar power industry. As a result of the proliferation in solar installations following the passage of the IRA, leading up to its IPO, Nextracker reported material growth in its revenue. For the fiscal year ended March 31, 2022, the Company reported $905 million in annual revenue for its U.S. business, representing 62% growth over the prior year period.[1]

8. Investors closely track Nextracker's backlog, viewing it as a measure of the health of Nextracker's business. Nextracker defines backlog as executed contracts or purchase orders with deposits and specific bills of material for specific projects with indicated start dates. The length of time it will take the Company to fulfill backlog orders is highly material to investors, as this will determine the rate at which Nextracker is expected to recognize revenue from its work on contracted

---

[1] The Company's fiscal year ends on March 31.

projects in future periods, and thus provides an important indication of the Company's revenue trajectory and expected growth rate. As of March 31, 2023, Nextracker stated that its backlog had grown to $2.6 billion, representing a 90% increase year-over-year. By Nextracker's third fiscal quarter ended December 31, 2023, the Company's backlog had grown to record levels, significantly exceeding $3 billion. Nextracker's revenue and adjusted earnings had risen in tandem, growing to $710 million (up 38% year-over-year) and $168 million (up 168% year-overyear) during the quarter, respectively.

9. The solar tracking industry is subject to the risk that projects may become delayed due to a variety of reasons, such as an inability to timely secure necessary permits for project completion, the unavailability of project components or materials, regulatory hurdles, inclement weather, or construction setbacks. In Nextracker's IPO prospectus, the Company stated that delays were possible and "could have a material adverse effect on [its] business, financial condition and the results of operations."

10. Since Nextracker's IPO, however, Defendants repeatedly downplayed the impact that project delays on the Company's operations and financial results, representing that any delays were limited to isolated projects and that expanding business opportunities—the volume of projects—more than offset any isolated

delays. In turn, according to Defendants, expanding business opportunities and client demand supported their repeatedly raising annual guidance each quarter.

11. By the beginning of the Class Period, however, project delays were materially impacting Nextracker's revenues. Panel availability, interconnection and permitting delays, and delays caused by customers awaiting clarity on the IRA all materially impacted the Company's ability to convert its backlog to revenue in line with its historical conversion rates. Nextracker could no longer conceal the impact of these delays.

12. On August 1, 2024, Nextracker announced its financial results for its first fiscal quarter for 2025, ended June 30, 2024. In a press release, the Company disclosed that its revenue had declined sequentially, from $737 million in the fourth fiscal quarter of 2024 to $720 million during the first fiscal quarter of 2025. Nextracker's GAAP gross profit had declined sequentially from $340 million in the fourth fiscal quarter of 2024 to $237 million during the first fiscal quarter of 2025. In a subsequent earnings call, Defendants finally admitted that the headwinds that had been impacting the overall industry had impacted Nextracker too. The Company maintained its previous guidance, however, indicating that it had already forecast the material impact of the delays that they disclosed. This caused Nextracker's common stock price to fall materially on heavy volume.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

17. Lead Plaintiff Ryan Barker, as set forth in the certification filed with his Motion for Appointment as Lead Plaintiff and Approval of Choice of Counsel (ECF No. 26-2), purchased Nextracker common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Additional Plaintiff Charles Bennett, as set forth in the certification filed herewith as Exhibit A and incorporated by reference herein, purchased Nextracker common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Nextracker, which is incorporated in Delaware and headquartered in Fremont, California, sells software that enables solar panels to follow the sun's movement across the sky and related products and services. Nextracker common stock trades on the NASDAQ under the ticker symbol "NXT."

20. Defendant Shugar was at all relevant times the CEO, and a co-founder, of Nextracker.

21. Defendant Bennett was Nextracker's CFO during the Class Period until May 2024, when he transitioned to be the Company's Chief Accounting Officer.

22. Defendant Wenger was at all relevant times President and a director of Nextracker.

23. Defendant Boynton has been CFO of Nextracker since May 2024.

24. Defendant Miller was at all relevant times the Chief Operating Officer ("COO"), and a co-founder, of Nextracker.

25. Defendants Shugar, Bennett, Wenger, Boynton, and Miller are sometimes referred to herein as the "Individual Defendants."

26. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

27. Nextracker is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles

of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

28. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Nextracker under *respondeat superior* and agency principles.

29. Defendant Nextracker and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

30. Defendant Shugar and five other members of its leadership team co-founded Nextracker in 2013 as a spin-off from Solaria Corporation. Nextracker provides solar tracker and software solutions used in utility-scale and ground-mounted distributed generation solar projects around the world. Its products are designed to enable solar panels in utility-scale power plants to follow the sun's movement across the sky, improving exposure to the sun and, in turn, plant performance. The Company's products offer return on investment for utility-scale solar projects by optimizing and increasing energy production and reducing costs.

31. Flextronics (n/k/a "Flex") purchased Nextracker in 2015. Then, in February 2023, Flex spun-off Nextracker, completing an IPO and raising $638

million. In January 2024, Nextracker announced that Flex had sold its remaining interests in the Company

32. Before groundbreaking, utilities and regional grid operators require projects seeking to connect to the grid to undergo a series of studies. This process establishes what new grid system upgrades may be needed before a project can connect to the system and then estimates and assigns the costs of that equipment. The lists of projects that have applied to connect to the grid and initiated this study process are known as "interconnection queues." Only after the studies culminate in an interconnection agreement can a project be built and reach commercial operation.

33. Historically, project delays principally from interconnection and permitting issues and equipment availability routinely interfere with the timing of utility-scale solar projects, depressing revenue for industry participants. An April 2024 report from the Lawrence Berkeley National Laboratory, "Queued Up: 2024 Edition Characteristics of Power Plants Seeking Transmission Interconnection As of the End of 2023," ("Berkeley Report") explained that while developer interest in solar projects was strong, completion rates were low and average time projects spent in queues before being built had increased markedly. Simply stated, interconnection issues delayed solar projects that deployed Nextracker's hardware and software.

### B. As a Public Company Defendants Raise Annual Guidance Every Quarter

34. Nextracker provides full-year guidance to investors, including projections for revenue, adjusted EBITDA, and adjusted earnings per share.

35. On May 10, 2023, Nextracker announced financial results for the fourth quarter and fiscal year ended March 31, 2023—its first results announcement after becoming a public company. Reporting revenue of $518.4 million for the quarter and $1.9 billion for the full fiscal year, the Company highlighted that its backlog of projects grew to a record $2.6 billion, a 90% year-on-year increase, with key wins in North America, Latin America, Australia, India, and Europe. Nextracker also issued guidance for the 2024 fiscal year, forecasting revenue of $2.1 billion to $2.3 billion, GAAP net income of $175 million to $205 million, GAAP earnings per share of $1.20 to $1.40, adjusted EBITDA of $265 million to $305 million, and adjusted non-GAAP earnings per share of $1.35 to $1.55 (which excluded $0.15 for stock-based compensation expense and net intangible amortization).

36. On July 26, 2023, Nextracker reported its financial results for the first quarter of fiscal year 2024. The Company also raised its guidance for the full fiscal year. Nextracker forecast revenue of $2.2 billion to $2.4 billion, GAAP net income of $176 million to $205 million, GAAP earnings per share of $1.20 to $1.40, adjusted EBITDA of $290 million to $340 million, and adjusted non-GAAP

earnings per share of $1.45 to $1.65 (which excluded $0.25 for stock-based compensation expense and net intangible amortization).

37. On October 25, 2023, Nextracker reported its financial results for the second quarter of fiscal year 2024. The Company again raised its guidance for the full fiscal year. Nextracker forecast revenue of $2.3 billion to $2.4 billion, GAAP net income of $237 million to $266 million, GAAP earnings per share of $1.60 to $1.80, adjusted EBITDA of $390 million to $440 million, and adjusted non-GAAP earnings per share of $1.95 to $2.15 (which excluded $0.35 for stock-based compensation expense and net intangible amortization).

38. On January 31, 2024, Nextracker reported its financial results for the third quarter of fiscal year 2024. The Company once more raised its guidance for the full fiscal year ending March 31, 2024. Nextracker forecast revenue of $2.425 billion to $2.475 billion, GAAP net income of $374 million to $429 million, GAAP earnings per share of $2.53 to $2.90, adjusted EBITDA of $475 million to $500 million, and adjusted non-GAAP earnings per share of $2.55 to $2.75 (which excluded $0.30 for stock-based compensation expense and net intangible amortization and $0.28 to $0.45 of benefit from IRA 45X tax credit vendor rebates).

39. Thus, for each of the three quarters preceding the Class period, Defendants raised Nextracker's annual guidance, supporting that the tailwinds Defendants touted were actually prevailing over the industry-wide headwinds.

### C. Defendants Possess Real Time Information on the Project Delays and Their Impact on Nextracker's Financial Results

40. Former employees ("FE") of Nextracker in a position to and with access to material, relevant information confirm that Defendants tracked and had real time access to all information about projects, including and especially project delays.

41. FE1 served Nextracker as Assistant Project Manager from February 2023 through November 2024, when, FE1 remembers, Nextracker reduced its headcount by a large group of employees. FE1 reported to David Mitchell, Senior Projection Manager ("Mitchell"), who reported to Aaron White, Senior Director of Operations North America ("White"). In turn, White reported to Tim Cain, VP of Global Operations ("Cain").

42. As an Assistant Project Manager, FE1 oversaw a number of customer solar projects that were at different stages of development. Their main priority was to ensure that equipment arrived to the site on time, including regular interaction with customers, checking the status of the projects they oversaw, addressing any customer needs, tracking the status of equipment Nextracker had manufactured for each project, tracking the equipment's transit to the site, confirming delivery, and updating internal tracking systems about the project's progress and equipment delivery.

43. According to FE1, it was common for customers to delay equipment delivery to project sites. Some delays related to customer issues such as site preparedness or sufficient workforce to receive equipment, but permitting delays, according to FE1, were also common.

44. FE1, like all Nextracker project managers, tracked projects with two different Excel spreadsheets, both of which showed the status of deliveries for each project. The first spreadsheet, according to FE1, was the Project Delivery Schedule, a detailed spreadsheet tracking every single piece and part for equipment that Nextracker had contracted to deliver to the customer. According to FE1, Nextracker and its project managers tracked parts in transit, parts delivered, and outstanding orders. A color coded system that changed colors based on missed dates or delays, the Project Delivery Schedule showed what equipment was coming and what was delayed.

45. Project managers were able to pull data about the status of equipment for inclusion into the Project Delivery Schedule from another Excel spreadsheet from the logistics team called the “Project Dashboard” that project managers used to track projects. According to FE1, the Project Dashboard showed a higher-level view of the status of equipment delivery to projects and included information about project financials, a running logbook of progress notes about the project, and action

items. The dashboard also had bar graphs that showed the overall percentage of delivered equipment by project.

46. According to FE1, through their direct report Mitchell, Nextracker mandated that project managers keep their project spreadsheets up to date because senior leaders reviewed them to stay current themselves on what was happening with projects, including equipment deliveries. Each week, a group including senior Nextracker managers such as White and Cain. According to FE1, Nextracker Chief Operating Officer ("COO") and Company co-founder, Defendant Miller, checked the Project Dashboard frequently, reviewing individual projects in detail. Indeed, according to FE1, Mitchell conveyed that Miller had looked at one of FE1's projects on the Project Dashboards. Mitchell conveyed to FE1 that Miller had questions about the specific of individual projects or requested that FE1 add more detail.

47. In addition to the Project Dashboard to which senior management had access and Miller frequently reviewed, according to FE1, Nextracker project managers attended weekly project manager meetings. Every week, according to FE1, project managers met with their senior project manager and the logistics team to discuss project progress, project needs, equipment status, deliveries, and delays. The project team scrutinized every project, discussing delays and even potential delays, forecasting out six months. According to FE1, project teams coordinated to try to work around potential delivery delays by looking for replacement equipment

from other projects and/or air shipping product. Project teams worked hard to avoid delays, because senior project managers reported on significant delays, including delivery delays, to Nextracker's senior leadership.

48. Defendant Shugar had direct access to the Project Dashboard and, according to FE1, Shugar was a hands-on CEO. Indeed, FE1 was aware that customers' executives contacted Shugar directly to discuss delivery issues.

49. FE2, a project manager from July 2024 through April 2025, after Nextracker terminated Dan Lewarchick, FE2 reported to Senior Project Manager Mitchell. FE2 recalls that Mitchell reported to Maxwell Kommor, Director – Projects, U.S. Central & East ("Kommor"), and White. In turn, White reported to Cain, who reported directly to Miller. As a project manager, FE2 oversaw approximately six to seven solar site projects at NEXTracker, increasing to eleven projects when a colleague took two months for on paternity leave.

50. FE2 became aware that Nextracker's customers faced permitting delays that slowed progress at solar sites, and consequently, led to the customers requesting that Nextracker delay delivery of equipment. Indeed, according to FE2, one of the Engineering, Procurement, and Construction ("EPC") companies he dealt with on several projects experienced problems with permitting at a few of their sites. The EPC, DEPCOM Power, was building about seven sites, deploying Nextracker equipment, of which FE2 was aware, of which, FE2 recalls, two to three had

permitting delays, prompting DEPCOM Power to request Nextracker to delay delivery of its tracker equipment. According to FE2, most of the delivery delays of which they were aware began before he assumed responsibility for the project, that is, before his July 2024 start date. Another project experiencing delay occurred after FE2 assumed responsibility for the project. That is, of his approximately eleven projects three to four experienced delays. According to FE2, delays lasted months to years, including one project that experienced a delay until 2027.

51. Confirming FE1's recollection of the Company's means of tracking projects, including delays, FE2 used the Project Dashboard to track each of their projects. The Company expected FE2 to maintain the Project Dashboard for his projects timely, frequently updating the progress of each project, including deliveries, expected deliveries, and delays. According to FE2, when customers asked to delay delivery of Nextracker equipment, FE2 was responsible for noting that in the Project Dashboard. According to FE2, Nextracker closely monitored delays, and if a customer was delaying delivery for a few weeks or months, FE2 highlighted that information in the Project Dashboard in the color red, including details about why the customer needed the delay, such as a permitting issue.

52. FE2 emailed the Project Dashboard weekly to Nextracker senior management, copying directly (a) Mitchell (b) Kommor, (c) White, (d) Cain, and (e) Miller. Again, confirming FE1, according to FE2, Miller scrutinized the Project

Dashboard, asking project managers specific questions about their individual projects and their Project Dashboard entries. For example, FE2 recalls Miller asking him directly about a billing delay for one of the projects FE2 oversaw. According to FE2, senior management paid close attention to tracking deliveries and the expected revenue recognition, evidenced by the questions that senior leadership and Miller asked project managers after reviewing the Project Dashboard.

53. More, according to FE2, every two weeks, project managers received an email with a large Excel spreadsheet, called the Revenue Recognition Forecast, a large macro sheet for the Company tracking expected revenue recognition. For each project, the spreadsheet showed the expected revenue recognition from scheduled deliveries on a week-to-week basis, listing the revenue expected the Company anticipated recognizing weekly per project. According to FE2, the Company required project managers to review the week-by-week revenue recognition expectations for each of their projects and either approve what was on the report or adjust it due to expected changes and/or delays. To accomplish this, project managers accessed the internally shared document and changed the numbers in the data cells.

54. According to FE2, project managers were able to scan the Revenue Recognition Forecast to review what other project managers had input and approved. During FE2's tenure, most of the time, the project managers' forecasts

were unchanged, but FE2 recalls that occasionally, non-project managers adjusted the forecasts. FE2 adjusted their forecasts once to account for permitting delays.

55. More, according to FE2, Kommor reported directly to Nextracker's senior leadership about the status of revenue recognition reports that project managers approved or adjusted. FE2 was aware that Kommor reported the information about changes in revenue recognition expectations because prior to Kommor's meetings with leadership for that purpose, he asked project managers questions in preparation. According to FE2, Kommor told project managers that he was about to meet with leadership, including White, Cain, and Miller.

56. FE3 was a senior project manager from March 2016 through November 2024. He reported to White, confirming that White reported to Cain who, in turn, reported directly to Miller. As a senior project manager, FE3 oversaw a group of Project Managers who themselves directly oversaw projects that had purchased Nextracker equipment for their solar sites. The project managers took over managing the projects when the projects transferred from sales to operations. In this position, FE3 had visibility on project progression, delays, the status of equipment deliveries, and revenue recognition.

57. According to FE3, approximately 20% of projects faced delays Company-wide. FE3 recalls that when a customer informed Nextracker about the need to delay delivery of equipment, project managers quickly reported up the

chain, virtually immediately upon receiving delay letters from customers. FE3 recalls that the highest levels of management received delay reports because delays required Nextracker to work with the customer to execute a change order, figure out what to do with the equipment, how it might impact the Company's financial results for the project, and if it led to liquidated damages. According to FE3, Miller received delay reports. Accordingly, FE3 insisted that project managers inform immediately when a customer requested a delay of delivery. In turn, FE3 immediately reported delays to White in weekly meetings who then reported to directly to Cain and Miller. According to FE3, Miller, Defendant Boynton and other senior Nextracker executives closely and constantly tracked the Company's financial results, including, importantly, the impact of project delays.

58. Confirming FE1 and FE2, FE3 recalls that project managers reported revenue recognition for their projects bi-weekly, on a Project Dashboard that all the senior executives received. This, enabled the Company to track revenues closely. Because, according to FE3, Nextracker did not recognize revenue until it delivered equipment to a project site, any delay meant that the Company could not recognize revenue.

59. FE4 was director of finance at Nextracker from April 2018 to April 2024. FE4's focused on global budgeting and forecasting. FE4 supported the accounting department, assisted with the quarterly close process, and helped with

reporting analytics. After Nextracker went public, FE4 began to support the investor relations department in preparation of financial disclosure documents. FE4 reported directly to then CFO Bennett.

60. According to FE4, the Company used Saleforce.com as its customer relations manager software to track its pipeline of potential sales. Once a potential sale became an executed contract with the customer, the contract and associate project was entered into and tracked in NetSuite. The Company also deployed NetSuite as its enterprise resource planning ("ERP") software, connecting operational data with financial data. According to FE4, NetSuite maintained and analyzed multiple aspects of the company's finances, including invoices, accounts payable, accounts receivable, and revenue recognition. NetSuite tracked the status of revenues recognition for all ongoing projects at the company, generating reports analyzing revenue recognition date, such as if it is on track with previous quarters and if it is on track with expectations for the current quarter and the year. According to FE4, Nextracker tracked revenue recognition in percentages of completion: as the Company delivered more equipment to the customer, it recognized more revenue. FE4 recalls that NetSuite tracked those percentages, generating reports showing those percentages for individual projects and across all projects.

61. Again, according to FE4, the Company closely tracked project delays that for the most part occurred before Nextracker delivered any equipment to the

customer. FE4 recalled the example of building permit delay that postponed the start date. Generally, once a project is approved, it has acquired necessary permits and is ready to start accepting Nextracker equipment. Once Nextracker starts delivering equipment to the customer, which also allows Nextracker to start recognizing revenue, there are typically no further delays in accepting that equipment. According to FE4, the Company monitored and tracked project start dates and delays.

62. According to FE4, permitting delays, solar panel supply challenges, and increasingly long wait times for interconnection to the electrical grids were common causes for project delays. According to FE4, project delays happened with frequency and senior managers constantly discussed project delays and their causes both internally and with customers.

63. Additionally, FE4 participate in weekly leadership meetings with Defendants Shugar and Bennett along with between 20 and 30 employees at levels of director and up from all the departments. FE4 recalls that during these weekly meetings attendees focused on updating that financial picture for the current quarter. Even as these weekly meetings did not review all projects, discussion focused, in material part, on project delays for large projects, as participants discussed material changes or a project delay that would disrupt the Company's expectations for the current or next quarter.

64. FE5 was also a project manager from October 2023 to January 2024. FE5 reported to Patrick Harbert, Senior Manager, who, in turn, reported to White. On the several projects FE5 managed, they communicated regularly with customers, checking on the status of projects, addressing customer needs, focusing on timely delivery of equipment, confirming delivery, and updating internal tracking systems about the project's progress.

65. Confirming other former employees, FE5 stated that the Company used highly detailed, robust Excel spreadsheets to document the status of each project with specificity. According to FE5, if a customer delayed a project due to permitting, for example, project managers noted it on the Project Dashboard. A second spreadsheet tracked all the equipment and material ordered for the project. According to FE5, this spreadsheet showed how much of each piece of equipment was ordered, when it was due, if it had been delivered, and if it was late. Each project had a schedule and specific dates for when NEXTracker equipment was due for delivery. That schedule was included in the spreadsheet for each project. This spreadsheet specified the project's timing and whether it was timely or delayed. "You would be able to see this is behind per the date it should have actually been there. You really could see what's going on."

66. According to FE5, Nextracker stressed to its project managers that they must keep their spreadsheets up to date in the computer system so that senior leaders

could have accurate and current information on the status of projects. Updating spreadsheets accurately was the top priority for project managers, so that senior management had an accurate picture of all projects continuously.

### D. In the Face of Persistent Investor Inquiry Defendants Expressly Downplay the Impact of Delays

67. From among their first statements as a public company, Defendants acknowledged certain "headwinds" impacting large solar projects in the United States, including interconnection and permitting delays. When investors and analysts questioned about these project delays, however, Defendants answered always that given robust expansion of the volume of projects the Company counted in its backlog, "tailwinds" continued propelling the Company's healthy financial results.

68. Whether this was true, over the next year, investors and analysts persistently and frequently asked Defendants about the impact of these headwinds. In response, Defendants repeatedly assured analysts and investors that, although these headwinds were impacting the industry, Company specific tailwinds, in totality, were stronger than the headwinds, enabling Nextracker to overperform relative to other companies in its space and to outpace Defendants' own guidance. Defendants knew, therefore, that investors and analysts were laser focused on the issue of project delays and their impact on Nextracker's financial results.

69. On May 10, 2023, during Nextracker's first earnings call as a public company, Defendant Shugar identified delays with electrical interconnection and permitting projects for construction as one of two major headwinds impacting solar growth in the US. Shugar stated that while these issues are usually solved on an individual project basis, they could delay project implementation significantly. The other major headwind was trade barriers to importing solar panels, especially those with Chinese content, which Shugar stated resulted in many projects being delayed until panels became available and materially impacted industry growth.

70. In response to an analyst's question about interconnection delays, however, Shugar denied material impact from these headwinds on Nextracker's financial results. Instead, he reassured investors that for Nextracker the quantity of potential projects outweighed the impact of delays, stating:

> It's a fact that the time required to achieve an interconnection permit or authorization has increased over time, how significantly this has been documented. And so, it's a factor, definitely. But the economics of solar are so strong and so many great developers and IPPs are out developing projects. There are 3,000 utilities in the United States, as kind of an interesting data point, and there's many, many projects in the interconnection queue. So, we're seeing an army of developer and IPPs just bringing forth high quality projects, they're advancing millions of dollars to perfect their project interconnection.
>
> But it goes to why we guide to an annual plan. Just to give you a sense, right? So our plan for this year, if you look at our $2.2 billion guide on average, we're delivering over $40 million a week during this upcoming period. So, if you have a single project that our customer is waiting for a permit to be able [ph] to close on (01:00:32) materials to

> capital [indiscernible] (01:00:34) of the quarter. So we're really focused on annual results, meeting customer needs and delivering positive profitability for the company. And I believe our results speak to that

71. Similarly, During a July 23, 2023, earnings conference call, Defendants again denied a material impact on Nextracker's results from the headwinds impacting the industry as a whole. In response to a question about permitting delays, Shugar stated: "Any individual project can be pushed…An advantage for us in managing so many projects in so many geographies is that if one project has slowed down, there's usually another wanting to take its place."

72. Again, claiming that interconnection delays had little impact on the Company's results, during an October 2023 earnings call, defendant Shugar stated that while interconnection issues occasionally delayed individual Nextracker projects in the United States and elsewhere, demand for its solutions was robust enough to offset those delays, expressing confidence that demand would continue expanding. Because customers often worked with Nextracker on more than one project, Shugar stated, even if one of the customer's projects was delayed, often another project could fill its gap. Shugar explained that the "huge amount" of demand for the Company's products and record results in revenue recognition enabled Nextracker to increase its guidance for the full year. Thus, while investors knew generally of interconnection delays impacting utility scale solar projects,

Defendants materially misrepresented to investors that these delays were not impacting Nextracker's earnings.

73. In November 2023, Nextracker's biggest competitor, Array Technologies, Inc. ("Array") disclosed that it was suffering from significant interconnection and panel availability issues that were causing project delays and shifts in the timelines for project completion "for a couple of quarters now."

74. In response to investor concerns about interconnection delays at its principal competitor, Defendants continued to deny material impact on Nextracker's results. For example, during a January 5, 2024, Goldman Sachs investor conference, Defendant Bennett stated that while industry "headwinds [including interconnection, permitting, and panel availability] are real…we see the tailwinds being significantly stronger than those headwinds." Bennett stated that while the Company sees more pushouts for interconnection, panels, and labor, "where we had 50 projects in the pipeline, we now have 250. So, we have the ability to manage and pivot to a different project and meet our commitments."

75. On January 31, 2024, Nextracker held an earnings call with analysts and investors to discuss the Company's third quarter 2024 results. On the call, Defendant Shugar touted "another strong quarter" that resulted in "record revenue, profits and backlog." Defendant Shugar claimed that Nextracker now had backlog "significantly exceeding $3 billion," and pointed out that this was "the third

consecutive quarter we've raised our revenue and profit guidance." Defendant Shugar highlighted "multiple headwinds and tailwinds impacting solar development velocity" in the United States, the Company's most important market. He stated that "in totality" the tailwinds of increased demand continued to offset the headwinds of "specific project" delays and that the conditions causing delays were improving, stating in pertinent part:

> Starting with the United States. As covered on our previous calls, there are multiple headwinds and tailwinds impacting solar development velocity. Headwinds, including interconnection backlogs, permitting delays and equipment shortages are real and can impact any specific project, EPC or developer. But in totality, the combination of new entrants in both developers and EPCs and the increasing number of projects in their portfolios has allowed the market to continue expanding.
>
> Solar panel availability in the United States has improved significantly over recent quarters. And as things stand today, we are not seeing panel availability as a first-order problem in the market. There are, however, multiple trade proceedings pending, which could impact panel imports from certain geographies into the US. We will need to see how this evolves over time to determine any potential impact.

76. During the question-and-answer portion of the call, Defendant Wenger was asked by an analyst whether any sizable projects that were pulled forward were responsible for the increased guidance. Defendant Wenger maintained that "[i]t really is just broader market acceleration." He added that "there's simply more developers and more EPCs" and "we're doing a good job . . . winning the share of the business . . . the demand strength is there."

77. Analysts hailed defendants' claims that Nextracker was apparently not suffering from the same delays that were affecting the rest of the industry. For example, *Barron's* reported that "Nextracker Is the Rare Solar Stock That Isn't Suffering From Slowing Demand."

78. Similarly, analysts at BofA Securities noted that Nextracker's purported ability to avoid project delays from impacting its portfolio and revenue conversion was in "contrast to [its] peers." On the basis of defendants' representations, price of Nextracker stock jumped by nearly 25% to $56.50 per share on February 1, 2024.

79. On February 7, 2024, Nextracker filed with the SEC on Form 10-Q the Company's financial results for its third fiscal quarter ended December 31, 2023, which was signed by Defendants Shugar and Bennett.

80. On March 5, 2024, Defendant Shugar spoke at the Bank of America Power, Utilities & Clean Energy Conference. The first question posed to defendant Shugar was how he expected Nextracker to grow in light of the hurdles to growth apparently affecting its peer companies. In response, defendant Shugar represented that the "tailwinds in totality are stronger than the headwinds[,]" pointing to the investment tax credit for solar projects under the IRA as an example of a tailwind while acknowledging that interconnecting queues are a headwind. While admitting that interconnection queues and permitting delays are a fact of the industry,

however, Shugar touted Nextracker's projected growth, stating that the universe of developers, number of projects at each developer, size of projects, and universe of vendors is much larger—effectively pointing to these tailings as offsetting the impact of delays.

81. On March 18, 2024, Defendant Wenger spoke at the Roth Conference. Philip Shen of Roth discussed a slowdown in solar projects generally asked Wenger about its impact on Nextracker:

> [W]e've been writing a bunch about how things are kind of slowing down for some US utility-scale players out there. We did a survey two weeks ago. I think a quarter of the 20 respondents, 24 volumes – COD [commercial operation date] is going to be lower now than they were three months ago for their same pipeline.
>
> So thus far, you guys have been able to avoid showing any of that slowdown. My guess is because you maybe winning some market share. But at some point because of your market share, being so big and high, the market, kind of, friction, I wonder, might impact you guys. So what are your thoughts on that? Do you see that happening already or do you think there are still enough share to be won to be able to offset that?

82. Defendant Wenger responded by touting demand and the Company's strong pipeline, specifically stating:

> First of all, what we do is we pull back and look at the macro demand for solar power and it's strong still globally in the key markets. The US being the number one market in the world for large-scale outside of China, and that's both in volume and also the economics are superior in the United States. And so what we're seeing is actually increased levels of development, meaning more investment from development and owners in large-scale solar. We're seeing our pipeline is actually growing over time. It's strong. There are headwinds and tailwinds we

> talk about. There are a number of headwinds that can cause a particular project in an owner's portfolio to move to the right and be delayed. It can be a high-voltage transformer or switchgear or not getting an interconnection agreement or not getting final approval to move forward.
>
> So things can move. We've seen some projects pull forward. And for us, I guess, being the market share leader, we have about 34% global market share in tracking. We have – and the third of our businesses outside of the United States, we have a diversified enough portfolio that we're managing to and so far, the results speak for themselves. We've been up and into the right and growing. We still see strong demand. It's a dynamic market. We're paying a lot of attention to the headwinds and the tailwinds.

## V. FALSE AND MISLEADING STATEMENTS

83. The Class Period begins on May 14, 2024, 44 days into the 91-day first quarter of fiscal 2025. During the Class Period, Defendants continued minimizing the impact of project delays on Nextracker's financial results even as the headwinds they persistently claimed were not impacting its financial results materially had, in fact, begun materially impacting the Company's results.

84. On May 14, 2024, Nextracker issued a press release announcing the Company's financial results for its fourth fiscal quarter and full year ended March 31, 2024. The release reported a 42% year-over-year increase in quarterly revenue to $737 million and a 120% year-over-year increase in quarterly adjusted EBITDA to $160 million. For the full year, the release reported results that exceeded Nextracker's full year guidance, including a 31% year-over-year increase in revenue to $2.5 billion, GAAP net income of $496 million, diluted earnings per

share of $3.37, a 150% increase year-over-year in adjusted EBITDA to $521 million, adjusted net income of $451 million, and adjusted diluted earnings per share of $3.06, with an end-of-the-year backlog of over $4 billion. The release also provided annual fiscal 2025 guidance of (i) revenue in a range of $2.8 billion to $2.9 billion; (ii) adjusted EBITDA in a range of $600 million to $650 million; (iii) GAAP net income in a range of $369 million to $399 million; and (iv) adjusted diluted EPS in a range of $2.89 to $3.09. According to Defendant Shugar, "[f]iscal year 2024 was a year of strong execution and significant growth for Nextracker, and we reached a record backlog of over $4 billion that more than tripled in 2 years." Defendant Shugar continued, "We've accelerated our pace of product innovation, scaled global revenue and supply chain, more than doubled our profits from the prior year, and exceeded all elements of our full year guidance."

85. The foregoing statement touting the Company's results and its exceeding its 2024 guidance was materially false and misleading. Defendants knew or recklessly disregarded at the time that they issued this press release that project delays were increasing and lengthening as a result of interconnection queue and permitting delays, and materially impacting Nextracker's results due to its inability to convert material backlog into revenue, like other companies in the same sector. When Defendants touted the potential from Nextracker's backlog, they rendered

themselves duty-bound to disclose that conversion of its backlog into revenue had already been impeded by project delays.

86. Also on May 14, 2024, Nextracker held an earnings conference call with analysts and investors to discuss Nextracker's fiscal year 2024 results and to guide for fiscal 2025. In his prepared remarks, Defendant Shugar stated that "strong execution by Team Nextracker enabled us to achieve record revenue, profits and backlog." Defendant Shugar added that "[s]trong sales momentum globally resulted in a new record backlog of over $4 billion," a 50% increase over the prior year and triple Nextracker's backlog two years ago. Defendant Shugar dismissed concerns investors and analysts had long raised and focused on about sector headwinds and interconnection and permitting, stating that the total universe of projects and customers had grown, stating:

> Nextracker's history of 30% CAGR over the last five years reflects favorably on the EIA forecast, as does our strong backlog.
>
> On prior earnings calls, we've had questions regarding sector headwinds and interconnection permitting and other areas. We noted that these headwinds can be real for any given project or customer, but that the total universe of projects and customers has grown such that in totality the market continued strong growth.

87. The foregoing statements touting the Company's momentum and backlog and minimizing the impact of industry headwinds were false and misleading. Defendant Shugar knew that the project delays as a result of interconnection queue and permitting delays were lengthening, and was minimally

reckless in ignoring the material impact of these delays on Nextracker's results and ability to convert backlog into revenue, like other companies in the same sector.

88. During the question-and-answer portion of the call, analysts asked defendants whether they were seeing any elongation of the time to convert Nextracker's backlog into revenue. Defendant Wenger denied that this was happening, stating that "we're pleased with the growth of our backlog" and that "[t]ypically" backlog converts to "revenue in two to eight quarters, and most of that in two to five quarters."

89. The foregoing statement touting the growth of the Company's backlog and reassuring about typical backlog conversion timing was false and misleading because Defendant Wenger knew that the project delays as a result of interconnection queue and permitting delays were lengthening, and was minimally reckless in ignoring the material impact of these delays on Nextracker's business and ability to convert backlog into revenue, like other companies in the same sector. Instead of admitting that when asked directly, Defendants deflected, instead touting the potential from their growing backlog while omitting the impact of delays.

90. On May 28, 2024, Nextracker filed with the SEC on Form 10-K the Company's financial results for its fiscal year ended March 31, 2024, which was signed by Defendants Shugar, Bennett, and Wenger. About the risk of project delays, Defendants stated:

> ***Delays in construction projects and any failure to manage our inventory could have a material adverse effect on us.***
>
> Many of our products are used in large-scale projects, which generally require a significant amount of planning and preparation and which can be delayed and rescheduled for a number of reasons, including customer or partner labor availability, difficulties in complying with environmental and other government regulations or obtaining permits, interconnection delays, financing issues, changes in project priorities, additional time required to acquire rights-of-way or property rights, unanticipated soil conditions, or health-related shutdowns or other work stoppages. These delays may result in unplanned downtime, increased costs and inefficiencies in our operations, and increased levels of excess inventory.

91. The foregoing risk disclosure about project delays generally and about interconnection delays specifically was materially false. As of May 28, 2024, the date of the 2024 10-K, interconnection and other delays that Defendants had previously claimed to have overcome with the volume of the Company's transactions had already had a material impact on Nextracker's results.

92. Also, in the 2024 10-K, about the risk of quarterly fluctuations in financial results and the difficulty of predicting those results, Defendants stated:

> ***Our results of operations may fluctuate from quarter to quarter, which could make our future performance difficult to predict and could cause our results of operations for a particular period to fall below expectations.***
>
> Our quarterly results of operations are difficult to predict and may fluctuate significantly in the future. Because we recognize revenue on projects as legal title to equipment is transferred from us to the customer, any delays in large projects from one quarter to another may cause our results of operations for a particular period to fall below

> expectations. We have experienced seasonal and quarterly fluctuations in the past as a result of fluctuations in our customers' businesses, changes in local and global market trends, as well as seasonal weather-related disruptions. For example, our customers' ability to install solar energy systems is affected by weather, such as during the winter months. Inclement weather may also affect our logistics and operations by causing delays in the shipping and delivery of our materials, components and products which may, in turn, cause delays in our customers' solar projects.
>
> Further, given that we operate in a rapidly growing industry, the true extent of these fluctuations may have been masked by our recent growth rates and consequently may not be readily apparent from our historical results of operations and may be difficult to predict. Our financial performance, sales, working capital requirements and cash flows may fluctuate, and our past quarterly results of operations may not be good indicators of future performance or prospects. Any substantial fluctuation in revenues could have an adverse effect on our financial condition, results of operations, cash flows and stock price for any given period. In addition, revenue, and other operating results in future fiscal quarters may fall short of the expectations of investors and financial analysts, which could have an adverse effect on the price of our common stock.

93. The foregoing statement about the risk of quarterly fluctuations in financial results and the difficulty of predicting those results, Defendants was materially false. As of May 28, 2024, the date of the 2024 10-K, interconnection and other delays that Defendants had previously claimed to have overcome with the volume of the Company's transactions had already had a material impact on Nextracker's results. The risk of the Company's growth masking fluctuations because of these delays had materialized because Defendants repeatedly

specifically touted the Company's recent growth rates, recklessly masking these delays through their own public statements.

94. On June 17, 2024, Defendant Boynton spoke about Nextracker at the JPMorgan Energy, Power & Renewables Conference. As at other investor conferences, the first question after introductions posed to Boynton regarded potential project delays affecting the solar tracking industry, reflecting the investor concern and interest in the impact of those delays on Nextracker and its operating results. Boynton stated that Nextracker had been resilient in the face of delays "because of the size and scale and ab[ility] to meet our customers' demands and really focus on on-time delivery."

95. The foregoing statements touting the Company's resiliency in the face of project delays in the solar tracking industry were false and misleading because Defendant Boynton knew that the project delays as a result of interconnection queue and permitting delays were lengthening, and was minimally reckless in ignoring the material impact of these delays on Nextracker's business and ability to convert backlog into revenue, like other companies in the same sector. By touting the Company's resilience and ability to meet its customers demands' and omitting the impact of these delays on Nextracker's customers' projects, Boynton materially misled investors.

## VI. THE TRUTH EMERGES

96. On August 1, 2024, after the close of trading, Nextracker issued a press release, announcing results for its first fiscal quarter ended June 30, 2024. The release revealed that Nextracker's revenue had declined sequentially, from $737 million in the fourth fiscal quarter of 2024 to $720 million during the first fiscal quarter of 2025. Similarly, Nextracker's GAAP gross profit had declined sequentially from $340 million in the fourth fiscal quarter of 2024 to $237 million during the first fiscal quarter of 2025. Defendants updated the market on the Company's FY25 revenue guidance, neither increasing nor decreasing its projection of GAAP revenues between $2.8 and $2.9 billion. Maintaining guidance was momentous, however, as for the first time since it became a public company, Defendants did not raise guidance in a quarterly announcement. Their maintaining guidance implied a slowdown in growth that alarmed investors.

97. In an earnings call held on August 1, 2024, Defendants belatedly admitted that, in fact, Nextracker had not effectively offset the timing headwinds impacting the overall industry as they had previously represented. Defendant Shugar conceded that "it is taking longer for projects to be fulfilled in real life due to" "construction permits or interconnection delays." Defendant Wenger further admitted that only "80% of that backlog is expected to be realized over the next eight quarters." When asked by an analyst if this was a shift from prior commentary

on Nextracker's backlog conversion rate, defendant Wenger acknowledged that yes, "[i]t is a bit of a shift, honestly." He continued:

> The project life cycles are getting a little bit longer[.] Dan mentioned that permitting and interconnection are now the drivers for the long pole in the tent or getting projects perfected. That has – is taking more time than it did two years ago, three years ago. And so in addition to things like module availability, which is a secondary or maybe even a tertiary issue, project cycles are moving somewhat to the right.

98. That Nextracker did not change its full-year guidance, however, reflects that its executives had already incorporated these material project delays into their forecasts, even as they repeatedly told investors that the Company was not affected by them. At minimum, by maintaining its guidance, Nextracker revealed that any revenue shortfalls caused by backlog conversion delays was a risk known by Defendants when they initially developed the full-year guidance. Had the backlog conversion delays been unforeseen, Defendants would have revised the full-year guidance downward to account for the anticipated revenue shortfalls.

99. About these results, J.P.Morgan North American Equity Research analysts Mark Strouse, Drew Chamberlain, and Michael Fairbanks wrote:

> NXT reported F1Q results well above expectations driven primarily by project timing. For the first time since going public, NXT did not raise FY guidance, which may disappoint some investors who have been lulled by the company's steady beat and raise cadence. ***NXT called out project permitting and interconnection timelines as headwinds, which although discussed by peers for the past several quarters, is incremental to NXT compared to prior commentary***. That said, demand remains solid with book:bill again over 1x. ***We are trimming***

> ***our revenue estimates***. We are also taking a slightly more conservative view of margins given higher than expected transport/freight costs and our read-thru for international margins. Our YE25 price target goes to $62, from $65. We maintain our Overweight rating and continue to view NXT as a core holding within our coverage. (Emphasis added).

100. About the interconnection delays that Defendants disclosed had impacted Nextracker, the J.P.Morgan analysts continued:

> Project timing becomes a headwind. NXT noted that project development cycles are extending, primarily owing to permitting and interconnection, and noted AD/CVD as a secondary impact. As such, the company expects ~80% of the >$4bn backlog to convert to revenue over the next eight quarters, with much of the residual 20% representing projects tied to VCA agreements with top-tier customers. The company noted that not all projects are impacted, there is no commonality amongst delayed projects (customer type, location, etc), and that just one project has been cancelled (less than 1% of projects over the past year). We believe these issues are not company-specific as evidenced by similar commentary from peers over the past few quarters.

101. As a result of this news, the price of Nextracker common stock dropped over 10%, from $46.83 per share when the market closed on August 1, 2024, to an August 2, 2024, close of $41.98 with over 8.9 million shares traded, over three times Nextracker common stock's daily trading volume. Nextracker's common stock continued declining the next trading day, closing on August 5, 2024, at $39.81 per share, a 15% decline from the August 1, 2024, close on over 5.1 million shares traded.

102. On October 30, 2024, in connection with reporting its second fiscal quarter of 2025 results, Nextracker revealed that its quarterly revenue and profit continued declining sequentially, to $636 million and $225 million, respectively. In addition, Defendants, again, reaffirmed FY25 revenue guidance of $2.8-$2.9 billion. Nextracker stock continued its downward trajectory, falling to lows of less than $34 per share by the end of calendar 2024.

103. As a result of Defendants' wrongful acts, material misstatement and omissions, and the precipitous decline in the market value of Nextracker common stock, Plaintiffs and other Class members (defined below) have suffered significant losses and damages.

## VII. CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased Nextracker publicly traded common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

105. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nextracker's shares actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nextracker or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

108. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Nextracker; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

109. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

110. The market for Nextracker securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, Nextracker securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Nextracker securities and the market information relating to Nextracker, and have been damaged thereby.

111. During the Class Period, the artificial inflation of Nextracker stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Nextracker's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Nextracker and its business and financial condition, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Nextracker securities at such artificially inflated prices, and each of them has been damaged as a result.

112. At all relevant times, the market for Nextracker securities was an efficient market for the following reasons, among others:

a) Nextracker stock met the requirements for listing, and was listed and actively traded on NASDAQ;

b) As a regulated issuer, Nextracker filed periodic public reports with the SEC;

c) Nextracker regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

d) Nextracker was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

113. As a result of the foregoing, the market for Nextracker securities promptly digested current information regarding Nextracker from all publicly available sources and reflected such information in Nextracker stock price. Under these circumstances, all purchasers of Nextracker securities during the Class Period suffered similar injury through their purchase of Nextracker securities at artificially inflated prices, and a presumption of reliance applies.

## IX. NO SAFE HARBOR

114. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements

pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## X. COUNTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton

115. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116. This Count is asserted against Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

117. During the Class Period, Nextracker, Shugar, Bennett, Wenger, and Boynton disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

118. Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Nextracker common stock during the Class Period.

119. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nextracker securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose

material adverse information and misrepresented the truth about Nextracker's business and operations.

120. By virtue of their positions at Nextracker, Defendants Shugar, Bennett, Wenger, and Boynton had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants Shugar, Bennett, Wenger, and Boynton acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants Shugar, Bennett, Wenger, and Boynton. Said acts and omissions of Defendants Shugar, Bennett, Wenger, and Boynton were committed willfully or with reckless disregard for the truth. In addition, each of these defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

121. Information showing that Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As senior managers and/or directors of Nextracker, Defendants Shugar, Bennett, Wenger, and Boynton had knowledge of the details of Nextracker's internal affairs.

122. Defendants Shugar, Bennett, Wenger, and Boynton are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Shugar, Bennett, Wenger, and Boynton were able to and did, directly or indirectly, control the content of the statements of Nextracker. As officers and/or directors of a publicly-held company, Defendants Shugar, Bennett, Wenger, and Boynton had a duty to disseminate timely, accurate, and truthful information with respect to Nextracker's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nextracker securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Nextracker's business which were concealed by Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton, Plaintiffs and the other members of the Class purchased or otherwise acquired Nextracker securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton, and were damaged thereby.

123. During the Class Period, Nextracker securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants

Nextracker, Shugar, Bennett, Wenger, and Boynton made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nextracker securities at prices artificially inflated by the wrongful conduct of Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Nextracker securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Nextracker securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

124. By reason of the conduct alleged herein, Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. As a direct and proximate result of the wrongful conduct of Defendants Nextracker, Shugar, Bennett, Wenger, and Boynton, Plaintiffs and the other members of the Class suffered damages in connection with their respective

purchases, acquisitions and sales of the Company's securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

126. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127. During the Class Period, the Individual Defendants participated in the operation and management of Nextracker, and conducted and participated, directly and indirectly, in the conduct of Nextracker's business affairs. Because of their senior positions, they knew the adverse non-public information about Nextracker's current and future business prospects.

128. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nextracker's business practices, and to correct promptly any public statements issued by Nextracker which had become materially false or misleading.

129. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nextracker disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, the Individual Defendants exercised their

power and authority to cause Nextracker to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Nextracker within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nextracker securities.

130. Each of the Individual Defendants, therefore, acted as a controlling person of Nextracker. By reason of their senior management positions and/or being directors of Nextracker, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nextracker to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Nextracker and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

131. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nextracker.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 3, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob A. Goldberg, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
aapton@zlk.com

Additional Counsel for Plaintiffs and the Class

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On June 3, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 3, 2025, at New York, New York.

/s/ Laurence Rosen

Laurence M. Rosen