Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone:(213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob A. Goldberg, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone:(215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
        lheifetz@rosenlegal.com

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIEL WEBER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTRACKER INC., DANIEL SHUGAR, DAVID BENNETT, HOWARD WENGER, and CHARLES BOYNTON,<br><br>Defendants. | Case No. 5:24-cv-09467-PCP<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:    December 4, 2025<br>Time:    10:00 a.m.<br>Judge:   Hon. P. Casey Pitts<br>Ctrm:    8, 4th Floor |

**TABLE OF CONTENTS**

I.    ISSUES TO BE DECIDED.................................................................................................. 1

II.    INTRODUCTION........................................................................................................... 1

III.    STATEMENT OF FACTS............................................................................................. 2

    A.    Background ......................................................................................................... 2

    B.    Defendants' Misrepresentations About The Impact of Delays ............................... 3

    C.    Defendants' Direct Visibility into Delays............................................................ 4

    D.    The Truth Emerges............................................................................................. 5

IV.    ARGUMENT ................................................................................................................ 6

    A.    Legal Standard.................................................................................................... 6

    B.    The Complaint Sufficiently Pleads Material Falsity ................................................. 7

        1.    Defendants Falsely Denied the Impacts of Industry-Wide Headwinds on NXT.................................................................................... 8

        2.    Defendants Made Materially False Statements about the Company's Backlog and Growth................................................................................ 12

        3.    The Company Made Materially Misleading Risk Disclosures ................... 14

    C.    The Complaint Sufficiently Pleads Defendants' Scienter....................................... 16

        1.    Defendants' Persistent Denials of Material Impact from Delays Raise an Inference of Scienter.............................................................................. 16

        2.    Defendants' Access to Adverse Information Supports an Inference of Scienter.............................................................................................. 18

        3.    Defendants Misled Investors Concerning Core Operations, Supporting an Inference of Scienter................................................................... 23

    D.    The Complaint Sufficiently Pleads Control Person Liability................................ 24

V.    CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................... 11, 12

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ............................................................................................. 23

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .................................................................................... 7, 18

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...................................................................................... 25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ...................................................................... 11, 14, 15, 17

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 & n.8 (M.D. Tenn. Dec. 18, 2017) ................................................. 20

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..................................................................................... passim

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ........................................................................................ 13

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................................ 20

*In re Eventbrite, Inc. Sec. Litig.*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) .............................................................. 10

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ......................................................................................... 14

*In re Fastly, Inc. Sec. Litig.*,
2025 WL 2721693 (N.D. Cal. Sept. 24, 2025) .......................................................... 8, 13

*In re Gilead Sciences Sec. Litig.*,
2009 WL 3320492 (N.D.Cal. Oct. 13, 2019) ................................................................ 20

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ........................................................................................ 7

ii

*In re Palo Alto Networks, Inc. Sec. Litig.*,
　2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) ............................................................ 10

*In re Quality Sys., Inc. Sec. Litig.*,
　865 F.3d 1130 (9th Cir. 2017) ....................................................................... passim

*In re Scholastic Corp. Sec. Litig.*,
　252 F.3d 63 (2d Cir. 2001) ................................................................................. 22

*In re Splunk Inc. Sec. Litig.*,
　592 F. Supp. 3d 919 (N.D. Cal. 2022) .................................................................. 8

*In re Vaxart, Inc. Sec. Litig.*,
　576 F. Supp. 3d 663 (N.D. Cal. 2021) .................................................................. 11

*Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*,
　2025 WL 2426714 (C.D. Cal. Aug. 20, 2025) ...................................................... 10

*Institutional Invs. Grp. v. Avaya, Inc.*,
　564 F.3d 242 (3d Cir. 2009) ....................................................................... 1, 17, 24

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018) ........................................................................ 7, 12

*Kong v. Fluidigm Corp.*,
　2023 WL 2134394 (9th Cir. Feb. 21, 2023) ........................................................ 11

*Leventhal v. Chegg, Inc.*,
　721 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................................... 10

*Longo v. OSI Systems, Inc.*,
　2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ...................................................... 23

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
　39 F.4th 1092 (9th Cir. 2022) ............................................................................ 11

*McGovney v. Aerohive Networks, Inc.*,
　367 F. Supp. 3d 1038 (N.D. Cal. 2019) ............................................................... 10

*Miller v. Thane Int'l, Inc.*,
　519 F.3d 879 (9th Cir. 2008) .......................................................................... 7, 11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
　320 F.3d 920 (9th Cir. 2003) ............................................................................. 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
　2024 WL 5182634 (9th Cir. Dec. 20, 2024) ........................................................ 18

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
　780 F. App'x 480 (9th Cir. 2019) ....................................................................... 12

iii

Opposition to Motion to Dismiss　　　　　　　　　　　　　　No. 5:24-cv-09467-PCP

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ................................................................................ 11

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014)................................................................................................ 17

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
   2025 WL 1900722 (N.D. Cal. July 9, 2025)............................................................. 7, 12, 18, 23

*Ross v. Career Educ. Corp.*,
   2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)........................................................................ 21

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008).................................................................................. 17, 18, 23, 24

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)............................................................................................ 12, 16

*Sinnathurai v. Novavax, Inc.*,
   645 F. Supp. 3d 495 (D. Md. 2022) ..................................................................................... 21

*Sodha v. Golubowski*,
   No. 24-1036, 2025 WL 2487954 (9th Cir. Aug. 29, 2025)........................................................ 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ........................................................................................................... 6, 16

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) ................................................................................. 11

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. June 19, 2020) ...................................................................... 11

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................................. 22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)................................................................................................. 20

**Statutes**

15 U.S.C. § 78t(a)................................................................................................................... 24

iv

Opposition to Motion to Dismiss                                No. 5:24-cv-09467-PCP

## I.     ISSUES TO BE DECIDED

1.      Do Plaintiffs sufficiently plead that Defendants materially misled investors when telling the public that Nextracker Inc. ("NXT"), unlike the solar industry as a whole, was not experiencing revenue declines or slowdowns from project delays?

2.      Do Plaintiffs sufficiently plead that Defendants acted with scienter by falsely telling investors that NXT was not experiencing revenue declines or slowdowns when they knew or recklessly disregarded facts showing otherwise?

## II.     INTRODUCTION

The Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") pleads that Defendants committed securities fraud to create and sustain a false narrative of exceptionalism. NXT and its senior executives deliberately projected a false image of unique immunity from the industry-wide headwinds that were battering its competitors. They assured the market that while others, like its chief rival Array Technologies ("Array"), struggled with systemic project delays, NXT's robust "tailwinds"—its massive backlog and diverse customer base—were more than powerful enough to overcome such challenges. This narrative, a cornerstone of its premium valuation in the market, was a fiction.

This case is on all fours with *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), in which the Third Circuit sustained a complaint pleading executives' denials of problems in close proximity to their eventual disclosure. In *Avaya,* the Third Circuit found that the core importance of the subject of the executives' denials and the temporal proximity of disclosure to their denials established a strong inference that they acted recklessly in making materially false statements. This is exactly what happened here. Throughout the 79-day Class Period, Defendants knew or recklessly disregarded internal reports showing that the same project delays that plagued the entire solar industry were materially impacting NXT's ability to recognize revenue.

This case is not, as Defendants would have this Court believe, a story of unforeseen business challenges or a failure to predict the future. Detailed and corroborative allegations from five former NXT employees make clear that Defendants misled investors when they touted the Company's

1

Opposition to Motion to Dismiss                                      No. 5:24-cv-09467-PCP

unique resilience to industry-wide headwinds. On a daily and weekly basis, NXT's internal tracking systems provided senior management with real-time, granular data showing that the industry headwinds that they minimized publicly were, in fact, materially impacting the Company's core operations. Defendants—including CEO Daniel Shugar, CFOs David Bennett and Charles Boynton, and COO Nicholas Miller—knew that project lifecycles were lengthening and that the rate of converting backlog into revenue was deteriorating. Defendants had access to specific, named internal reports like the "Project Dashboard" and the "Revenue Recognition Forecast," quantifying material delays with color-coded warnings and tracking their direct impact on the Company's financial outlook. Defendants focused on these project delays in weekly leadership meetings and, in the case of COO Miller, personally scrutinized the dashboards and questioned project managers about specific delays.

In spite of this knowledge, throughout the 79-day Class Period, in response to specific, pointed questions from analysts, Defendants repeatedly falsely claimed that project delays were not impacting the Company "in totality," that its backlog was converting within a "typical" timeframe, and that the business remained uniquely "resilient." The Company's SEC filings characterized the known, ongoing, and materializing risk of delays as a mere hypothetical possibility that "could" occur in the future.

On August 1, 2024, Defendants disclosed the truth—that growth had stalled because project lifecycles were, in fact, getting longer, a reality Defendant Wenger conceded at the time was "a bit of a shift, honestly," from Defendants' very recent commentary to the contrary. In response, the Company's stock price plummeted 15% on relatively high trading volume, erasing significant shareholder value and causing substantial losses for Plaintiffs and the Class.

## III.    STATEMENT OF FACTS

### A.    Background

NXT provides solar tracker and software solutions used in utility-scale and ground-mounted distributed generation solar projects worldwide. Its products enable solar panels to follow the sun's

2

movement, improving energy output and project performance. ¶30.[1] A key metric for investors is the Company's backlog, defined as "executed contracts or purchase orders with deposits and specific bills of material for specific projects with indicated start dates." ¶8. The conversion of backlog into revenue is highly material to investors because it dictates when Nextracker's reported revenues will be realized. ¶8.

The solar industry as a whole is well-known for delays due to permitting, interconnection, supply chain shortages, regulatory hurdles, inclement weather or construction setbacks. ¶9. Defendants themselves identified two major headwinds impacting solar growth in the United States: (1) interconnection and permitting projects for construction, and (2) trade barriers to importing solar panels, especially those with Chinese content. ¶69. Yet while competitors like Array acknowledged that such delays had already been disrupting their projects "for a couple of quarters now," NXT told a very different story. ¶73. NXT cast itself as largely unaffected from industry-wide headwinds, repeatedly highlighting backlog growth and resilience, and suggesting that expanding opportunities more than offset any project slowdowns.

**B.    Defendants' Misrepresentations About The Impact of Delays**

Defendants told investors that "company-specific tailwinds" propelled NXT's growth and insisted that "the tailwinds were stronger than the headwinds." ¶¶ 67-68. CEO Daniel Shugar reassured investors that "if one project has slowed down, there's usually another wanting to take its place." ¶71. Defendants raised annual guidance for three consecutive quarters leading into the Class Period, pointing to supposed tailwinds from the Inflation Reduction Act and "broader market acceleration." ¶9, ¶76, ¶80. They touted backlog growth and denied any elongation in the time required to convert backlog into revenue. ¶¶84-88. While NXT's SEC filings included generic risk disclosures about potential delays, these warnings were presented as hypothetical possibilities, even as Defendants assured investors that such risks were not materially impacting NXT. ¶9, ¶90-91.

Analysts and investors relied on these statements. *Barron's* hailed NXT as "the Rare Solar Stock That Isn't Suffering From Slowing Demand." ¶77. BofA Securities praised NXT's apparent

---

[1] Citations to "¶__" refer to the Complaint (ECF No. 46).

3

ability to avoid project delays that were affecting its peers. ¶78. On NXT's representations, NXT's stock price surged nearly 25% to $56.50 per share on February 1, 2024. ¶78.

In reality, however, by the start of the Class Period, Defendants knew that panel shortages, permitting and interconnection bottlenecks, and customer uncertainty regarding the Inflation Reduction Act were already "materially impacting NXT's ability to convert its backlog to revenue in line with its historical conversion rates." ¶11.

### C.    Defendants' Direct Visibility into Delays

Defendants were not speaking in ignorance. NXT's reporting tools and processes provided them with detailed, up-to-date visibility into the material impact of widespread project delays on revenue recognition. The Company's reporting tools included three key excel sheets: (1) "Project Delivery Schedule," which tracks every single piece and part of equipment for each project, with timelines for delivery and installation. ¶44; (2) "Project Dashboard" which shows a higher-level view of the status of equipment delivery to projects and included info about project financials, a running logbook of progress notes about the project, and action items. ¶45; and (3) "Revenue Recognition Forecast" which tracked expected revenue recognition on a weekly basis and is reported to senior leadership. ¶¶53-55. These spreadsheets were mandatory, updated weekly by project managers, and captured the most current information on project status. ¶¶46-47, 53-55. Delays, such as when customers lacked permits or interconnection approvals, were immediately reflected in the spreadsheets and escalated upward. According to former employees, senior executives such as COO Miller, checked the dashboard frequently and relied on it to monitor progress and delays. ¶45-47.

NXT also employed enterprise-wide software systems to track operations and financial performance. Salesforce managed customer interactions, while NetSuite tracked the status of revenue recognition for all ongoing projects at the company, generating reports and analyzing revenue recognition dates, such as if it is on track with previous quarters and if it is on track with expectations for the current quarter and the year. ¶60. These readily-available, Company-wide reports meant that management could not plausibly claim ignorance of systemic delays: the data was centralized, updated in real time, and reviewed regularly by senior leadership.

Opposition to Motion to Dismiss                    No. 5:24-cv-09467-PCP

Former employees confirmed that this information was escalated all the way to the Individual Defendants and discussed in regular management meetings. Former Employee 1 ("FE1"), an assistant project manager from 2023 to 2024, explained that it was common for customers to delay equipment delivery to project sites and that project managers had weekly meetings with senior project managers about the projects, including delays and workarounds, and that in turn, the senior project managers reported the delays to senior leadership. ¶¶43, 47.

Former Employee 2 ("FE2"), a project manager from 2024 to 2025, reported that several of his projects were delayed for months to years, and confirmed reports incorporating those delays were delivered to senior management and discussed in weekly reporting meetings. ¶49, ¶¶50-55.

Former Employee 3 ("FE3"), a senior director from 2016 to 2024, estimated that about 20% of projects faced delays and explained that these delays were quickly reported up the chain and addressed in weekly leadership meetings because of their financial significance. ¶¶56-57. He recalled that the highest levels of management received delay reports because delays required NXT to work with customers to execute a change order, figure out what to do with the equipment, how it might impact NXT's financial results for the project, and if it led to liquidated damages. ¶57.

Former Employee 4 ("FE4"), the Company's director of finance from 2018 to 2024, similarly confirmed that permitting, supply, and interconnection delays were a recurring focus of weekly leadership meetings attended by Shugar, Bennett, and other top executives. ¶62-63.

Thus, far from being isolated or hidden, delays were routinely identified, tracked, and escalated through NXT's reporting channels, including weekly leadership meetings where the Individual Defendants were present. Defendants were either aware of these problems or, at the very least, reckless in disregarding the information that their own employees and systems placed before them. ¶43-63.

**D.      The Truth Emerges**

On August 1, 2024, the truth came out. For the first time since going public, NXT did not raise its guidance when it reported results for the quarter ended June 30, 2024. ¶96. This was a sharp departure from the prior three quarters, during which Defendants had raised guidance each time,

5

Opposition to Motion to Dismiss                                        No. 5:24-cv-09467-PCP

claiming that "tailwinds" from market acceleration and their volumes of business outweighed industry headwinds. ¶¶67-68, ¶76). Analysts and investors came to view NXT's repeated guidance increases as proof that it was uniquely resilient compared to peers, such as Array, who were being significantly affected by the ongoing delays. ¶73. Thus, the decision to hold guidance flat was itself a red flag that the narrative was unraveling.

During the Company's August 1, 2024 earnings call, Defendants finally admitted what they had long denied: industry headwinds were materially impacting NXT. Shugar conceded that, just like other companies in the industry "it is taking longer for projects to be fulfilled in real life due to" "construction permits or interconnection delays." ¶97. Wenger acknowledged a "shift" in NXT's backlog conversion, revealing that only 80% of backlog would be realized over the next eight quarters, contrary to prior commentary. ¶97.

NXT's results confirmed the impact. Revenue fell from $737 million in the fourth fiscal quarter of 2024 to $720 million in the first fiscal quarter of 2025, while gross profit dropped from $340 million to $237 million in the same time period. ¶96. Market experts also reported on the headwinds that NXT faced, further highlighting the importance of these delays that NXT concealed and now just revealed. ¶¶99-100.

The market reacted sharply. NXT's stock price fell over 10% on the news and ultimately declined 15% in the days following. ¶101. Investors who had relied on Defendants' repeated assurances of resiliency and backlog strength suffered significant losses when the truth was revealed. ¶101-03.

These admissions confirmed what NXT's internal reporting systems and weekly leadership meetings had long shown: delays were neither hypothetical nor isolated, but were materially impairing the NXT's backlog conversion and revenues throughout the Class Period.

## IV. ARGUMENT

### A. Legal Standard

In assessing a Rule 12(b)(6) motion, courts consider the complaint in its entirety, "accept all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs,*

6

*Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, a court must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact . . . . A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Here, Defendants challenge falsity and scienter only. The Complaint adequately pleads both.

### B.    The Complaint Sufficiently Pleads Material Falsity

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023) (internal quotations omitted). Thus, "statements literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

The Complaint pleads that Defendants materially misled investors by making statements that gave "reasonable investor[s] the impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2025 WL 1900722, at *5 (N.D. Cal. July 9, 2025) (internal quotations omitted). Once Defendants decided to "tout positive information to the market, they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cut[] against the positive information." *Id.* (internal quotations omitted). Defendants overlook these standards in their motion to dismiss, arguing instead that their statements were either too immaterial to have misled

7

anyone and/or otherwise literally true and therefore not capable of supporting a claim for securities fraud. They are wrong.

Defendants' alleged false statements fall into three categories: (1) representations they made to analysts in response to direct questioning about NXT's backlog-to-revenue conversion cycle (¶¶86, 88, 94); (2) statements about NXT's backlog and revenue growth (¶¶84, 86); and (3) SEC filings that portrayed risks about backlog conversion and project installation delays as mere possibilities when, in fact, they had already materialized (¶¶90, 92). Plaintiffs adequately plead falsity for each category.

### 1. Defendants Falsely Denied the Impacts of Industry-Wide Headwinds on NXT

The first category of false statements consists of Defendants repeatedly and unequivocally denying that NXT was experiencing any elongation in the timing of backlog-to-revenue conversion in response to direct questions from analysts, even though delays had already materially impaired the Company's revenue recognition. Categorical denials in response to analyst questions are materially misleading when they contradict a present state of affairs. *See*, *e.g.*, *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *7–8 (N.D. Cal. Sept. 24, 2025) (holding "Statement 2" was false where defendants told analysts in response to questioning that "competitors are seeing [macro] effects, some slowing in growth, and [] we're not seeing that"); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 938–40 (N.D. Cal. 2022) (defendants misled analysts when responding to questions by omitting negative information about pipeline and demand).

For example, on May 14, 2024, during NXT's earning conference call, analysts directly asked:

> Maybe if I could start on the backlog here, another impressive quarter. Can you give us your latest forecast for converting that into revenue? ***Are you seeing kind of the conversion cycle elongate?*** I think, you've mentioned in the past that it typically the majority converts to revenue within a 12-month window. ***So just trying to see if there's any changes to that pattern or kind of a shift towards projects with extended timelines?***

¶88 (emphasis added). In response, Defendant Wenger replied with "We're pleased with the growth of our backlog. ***Typically, it results in revenue in two to eight quarters and most of that in two to***

8

*five quarters.*" ¶88. Similarly, Defendant Shugar concealed the existence of any slowdown when telling analysts that "On prior earnings calls, we've had questions regarding sector headwinds and interconnection permitting and other areas. We noted that these headwinds can be real for any given project or customer, but that the total universe of projects and customers has grown such that in totality the market continued strong growth." ¶86; *see also* ¶94 (Boynton explaining why NXT is "unique" and not experiencing negative impact from "project timing delays"). Such statements were not vague assurances or generalized optimism; they were explicit denials made in direct response to specific, pointed questions about whether NXT was experiencing elongation in backlog conversion.

Defendants' argument that Plaintiffs have not alleged "particularized facts" showing that these answers to analysts' questions were false is meritless. *See* Defs. Br. at 9-10. Plaintiffs' confidential witnesses directly observed delays and described the precise mechanisms by which those delays were reported to senior leadership, including Defendants.[2] These former employees ("FEs") confirm that these delays were ongoing and escalated to senior leadership well before their May 14 and June 17, 2024 statements. FE1, an assistant project manager employed from 2023 to 2024, explained project delays occurred often and that project managers discussed delays in weekly meetings with senior project managers, who then reported them up the chain to senior leadership. ¶43, ¶47. FE2, a project manager employed from 2024 to 2025, confirmed that several of his projects were delayed "months to years," and that forecasts incorporating those delays were delivered directly to senior executives and discussed in weekly reporting meetings. ¶¶49-55. FE3, a senior project manager employed from 2016 to 2024, likewise stated that 20% of projects faced delays and that these delays were quickly reported up the chain and regularly addressed in weekly leadership meetings because of their financial significance and the need for subsequent remedial actions. ¶¶56-57. FE4, director of finance from 2018 to 2024, corroborated that permitting, supply, and interconnection delays were a recurring focus of weekly leadership meetings attended by Shugar, Bennett, and other top executives. ¶¶59-63. These confidential witnesses are sufficient at the pleading

---

[2] Plaintiffs address the sufficiency of the Complaint's allegations from confidential witnesses in detail in Section IV.C.2, *infra.*

Opposition to Motion to Dismiss                                              No. 5:24-cv-09467-PCP

stage to demonstrate that Defendants' statements were false and/or materially misleading. *See*, *e.g.*, *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1012–13 (N.D. Cal. 2024) (falsity allegations sufficient at pleading stage where former employees supported plaintiffs' theory of liability)

Defendants' reliance on *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247 (N.D. Cal. Apr. 11, 2025), *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038 (N.D. Cal. 2019), and *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078 (N.D. Cal. Apr. 28, 2020), is inapposite. *See* Defs. Br. at 10. Those cases did not involve defendants who made misrepresentations in response to direct analyst questions but instead concerned "general comments" about the popularity of a product and past/future sales. *Palo Alto Networks*, 2025 WL 1093247, at *4. The allegations in those cases also did not include confidential witness allegations describing the defendants' familiarity with and scrutiny over the alleged concealed adverse information, like Plaintiffs plead in this case. *See*, *e.g.*, ¶¶46-47 (FE1 describing Miller's scrutiny of "Project Dashboard"); ¶52 (FE2 describing how he emailed "Project Dashboard" weekly to senior management, including Miller); ¶57 (FE3 confirming Miller received "delay reports"). Plaintiffs' allegations are markedly different than the ones in the cases cited by Defendants and, as such, are more than sufficient to adequately state a claim at the pleading stage. *See Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2025 WL 2426714, at *2 (C.D. Cal. Aug. 20, 2025) (holding plaintiffs "sufficiently plead[ed] falsity . . . because the statements [about backlog and macroeconomic factors] created an impression of a state of affairs that differed in a material way from what actually existed").

Defendants' efforts to reframe their categorical denials that industry-wide headwinds were impacting the Company's revenue recognition as puffery, opinions, or even vague, subjective assessments are unavailing. Defs. Br. at 13-14. These were not vague expressions of corporate optimism, but explicit denials made in direct response to specific questions about whether NXT was experiencing elongation in backlog conversion. In that context, investors were entitled to rely on Defendants' assurances as materially accurate descriptions of NXT's present operations. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017); *Rivian Auto., Inc.*, 2025 WL 2426714, at *5 (holding statements "not corporate puffery because they are not vague statements of

10

optimism. Rather, these statements address metrics such as increasing demand and increased production which the FAC alleges Defendants stated they monitored 'daily' and/or are objectively verifiable"); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 881 (N.D. Cal. 2023) (holding statements false and misleading when read in context with other statements).

These statements went beyond puffery and optimism given the context in which they were made and the fact that they provide a "concrete description of the past and present state of [NXT's backlog and revenue conversion rate]." *Quality Systems*, 865 F.3d at 1143–44 (holding that statements claiming that the company's pipeline is "very consistent," "deep," and "keeps growing," and that "[t]here is nothing drying up" were actionable and not mere puffery"); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 758 (9th Cir. 2023) (holding that statements made in response to an analyst's question claiming that the company has "plenty of pipeline . . . to deliver upon the guidance we've given you for the full year" was affirmatively creating a false impression and actionable); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984 (9th Cir. 2008) (holding that the touting of backlog was actionable when defendants, in fact, knew there were stop-work orders that halted significant amounts of work).

Nor can Defendants escape liability by parsing each statement in isolation. Defs. Br. at 10-12. Statements "literally true on their face may nonetheless be misleading when considered in context." *Thane,* 519 F.3d at 886. *See also Pampena v. Musk*, 705 F. Supp. 3d 1018, 1044 (N.D. Cal. 2023) (defendant misled investors about "but user data" even if supported by "random sample" of data); *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670–71 (N.D. Cal. 2021) (press releases misled investors about status of partnership even if literally true and investors could have "parse[d]" wording to "cut through the hype"). When considered together, Defendants' repeated denials of the impact of industry-wide headwinds on NXT conveyed the unmistakable impression that the Company was not experiencing the same delays plaguing its competitors, when in reality they were. The context in which Defendants' statements appeared sets this case apart from, for example, *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022), *Kong v. Fluidigm Corp.*, 2023 WL 2134394 (9th Cir. Feb. 21, 2023), and *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568

11

(N.D. Cal. June 19, 2020), cited by Defendants. Defs. Br. at 12-13. The statements at issue were not unprompted general opening comments but instead given to in response to direct analyst questions on the precise topic that Defendants materially misrepresented. Moreover, unlike the cases Defendants cite, NXT was not experiencing "record" or "strong" growth but, as alleged, a slowdown in revenue caused by trends that Defendants claimed had not and were not impacting NXT. *See*, *e.g.*, ¶¶87, 89.

For these reasons, Plaintiffs adequately allege "falsity" for Defendants' responses to analyst questions concerning NXT's backlog, project delays, and conversion-to-revenue timing.

### 2.    Defendants Made Materially False Statements about the Company's Backlog and Growth

Defendants also falsely affirmatively misrepresented NXT's backlog and revenue growth in press releases and earnings calls. "[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that [will not] mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quoting *Berson*, 527 F.3d at 987).

Defendants affirmatively touted NXT's "record" execution, backlog, and guidance while downplaying industry headwinds. ¶¶84-87. Having chosen to highlight NXT's backlog as a measure of strength and reliability and their key competitive advantage, Defendants had a duty to disclose that contemporaneous permitting and interconnection delays were materially impairing the conversion of backlog into revenue. *See Berson*, 527 F.3d at 987 (statements about "backlog" misleading where defendants omitted "stop-work orders"); *see also Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (statements about "'real-time' nature" of theft alerts misleading where alerts were "sent more than one week late"); *Khoja*, 899 F.3d at 1010 (statements about "positive 25 percent interim results" misleading in light of omission that results were "unreliable"); *Schueneman*, 840 F.3d at 705–06 (defendants required to disclose negative information about "Rat Study" once they told public that "animal studies supported [drug's] safety"); *Stitch Fix*, 2025 WL 1900722, at *6 (where defendants knew that new customers from a new product line

12

converted at lower rates and spent less money than legacy customers, their statements lauding the additive nature of the line and its customers materially misrepresented the success of the new line). Without disclosure of those delays, investors were left with the false impression that NXT's backlog was unaffected by the same problems peers acknowledged. This omission rendered Defendants' touting of momentum and execution materially misleading because it significantly altered the total mix of information available to investors. *Sodha v. Golubowski*, No. 24-1036, 2025 WL 2487954, at *10 (9th Cir. Aug. 29, 2025) (holding that defendants were required to disclose material interim information because omitting the decline in several financial metrics and performance indicators materially altered the total mix of information available to investors); (finding that plaintiff adequately pled the scienter of a defendant who falsely denied that the company was experiencing the same "slowing in growth" as its competitor).

Defendants argue that the statements made in the May 14, 2024, press release and earning call are inactionable because they were literally accurate statements concerning NXT's performance in fiscal year 2024. Defs. Br. at 10-11. But "[a] statement that is literally true can be misleading and thus actionable under the securities laws. 'Misleading' has been defined as affirmatively creating an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 796 (9th Cir. 2017) (holding statement regarding MASCT being cleared as true but actionable because a reasonable investor would have believed it was cleared for the purpose defendant was marketing the product).; *Fastly*, 2025 WL 2721693, at *8 (accurate statement concerning past performance was irrelevant to the question of whether defendants materially misrepresented then-current state of affairs). These statements were misleading because they concealed the material impact of project delays on backlog conversion. In the May 14, 2024 press release, Shugar touted the "strong execution" and significant backlog growth of NXT. ¶84. In the same-day earnings call, Shugar reaffirmed record revenue, profits and backlog. ¶86. Plaintiffs do not claim that these statements were literally false, but rather that they materially misled investors because Shugar conveyed operational strength and resiliency that was inconsistent with reality at the time, which was that NXT was facing delays that were causing the Company's revenue conversion

13

Opposition to Motion to Dismiss                                    No. 5:24-cv-09467-PCP

rate to decrease. ¶¶85, 87. That reality rendered Defendants' statements about NXT's revenue and backlog growth materially misleading.

### 3.     The Company Made Materially Misleading Risk Disclosures

NXT's risk disclosures also materially misled investors. Defendants assured investors through boilerplate risk disclosures in the Company's public statements that permitting and interconnection delays "may" occur. These risk disclosures were materially false and misleading because such delays had already materialized and were already materially impairing NXT's ability to convert backlog into revenue.

The Ninth Circuit holds that "risk disclosures can be misleading to investors when they speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition." *Glazer*, 63 F.4th at 781 (internal quotations omitted). In *In re Alphabet*, the company's risk disclosures stated that "[t]here have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017" when in reality the April 10-Q filing was made after the detection of cybersecurity issues and after internal deliberation based on a memo relating to the security issues. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702 (9th Cir. 2021). The Ninth Circuit held that the complaint plausibly alleged that the omission of these security issues and memo made the risk disclosure in the Form 10-Qs materially misleading to a reasonable investor and significantly altered the total mix of information available to investors. *Id*; *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (amended Dec. 4, 2023) (holding that risk warnings of the potential misuse of Facebook user data could harm its business, reputation, and competitive position were actionable when Facebook knew Cambridge Analytica had already improperly accessed and used such data).

Defendants' risk disclosures in NXT's annual report warned investors that project delays and interconnection issues may occur and could materially affect operations. ¶90. Specifically, on May 28, 2024, NXT warned investors in its annual report that, "Delays in construction projects and any failure to manage our inventory could have a material adverse effect on us . . . These delays may result in unplanned downtime, increased costs and inefficiencies in our operations, and increased

14

levels of excess inventory." ¶90. Defendants further warned about quarterly fluctuations in financial results, stating "given that we operate in a rapidly growing industry, the true extent of these fluctuations may have been masked by our recent growth rates and consequently may not be readily apparent from our historical results of operations and may be difficult to predict . . . Any substantial fluctuation in revenues could have an adverse effect on our financial condition, results of operations, cash flows and stock price for any given period." ¶92. But the hypothetical "delays" and "fluctuations" had *already* materialized and were *already* materially impairing NXT's ability to convert backlog into revenue. Former employees confirm that these delays were ongoing and escalated to senior leadership well before the annual report was filed on May 28, 2024. *See* ¶¶43-63 (former employee allegations describing internal tracking and discussion of project delays). In light of these detailed and corroborated accounts, Defendants' boilerplate assertion that Plaintiffs have failed to plead "particularized facts" is without merit.

Defendants deny that risk of project delays and fluctuations in financial results had already materialized by the time these risk disclosures were made, attempting to use NXT's 1Q25 earnings to rebut Plaintiffs' allegations. Defs. Br. at 17. However, the Complaint pleads, based on reports from multiple FEs, that permitting, interconnection, and supply delays were already ongoing and repeatedly reported to senior management well before May 2024. ¶¶43, 47, 49-57, 59-63. One quarter of earnings does not mean they were not happening, and their impact on backlog conversion is the reason that Defendants admitted on August 1, 2024 that only 80% of backlog would convert over eight quarters. ¶96-97. The point is not whether Defendants could still report positive results in the short term, but that their disclosures failed to inform investors of known, already-materialized risks impairing future revenue recognition. *See Glazer*, 63 F.4th at 781 (risk disclosures that speak as though such problems merely "may" occur are materially misleading when the risk is in fact happening).

Defendants further contend that delays are always a risk in the solar industry and that investors would understand such risks as ever-present. Defs. Br. at 17. This is a far cry from what Defendants told investors during the Class Period, however—including in response to direct questions from well-

Opposition to Motion to Dismiss                                    No. 5:24-cv-09467-PCP

informed analysts who understood the solar industry, and who accepted their answers. Defendants did not just minimize, but affirmatively touted NXT's supposed resiliency against these risks to specifically differentiate NXT from its competitors. ¶¶84, 86, 94. Against that backdrop, risk disclosures couched in boilerplate terms, such as "delays may occur," were misleading because they suggested only the possibility of delays and their impact on backlog conversion, when in fact those delays were already occurring and materially impacting NXT's revenue conversion. The reasonable investor was likely to believe the false narrative that NXT painted, that even with delays NXT's volume of backlog offset any impact on revenue recognition. The Ninth Circuit has made clear that to be effective, the cautionary language must be substantive and tailored to the risks at issue and cannot be boilerplate. *See Alphabet*, 1 F.4th at 703–04 (internal quotations omitted). Defendants do not meet that burden here. Consequently, the Complaint adequately pleads that NXT's risk warnings were materially misleading.

### C.     The Complaint Sufficiently Pleads Defendants' Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs*, 551 U.S. at 324-26. The test is simply an inquiry into "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," and is satisfied so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 322–24 (emphasis in original). A holistic review of the Complaint's allegations supports a cogent inference of scienter that is at least as compelling as the non-culpable inference Defendants assert.

### 1.     Defendants' Persistent Denials of Material Impact from Delays Raise an Inference of Scienter

Defendants repeatedly denied the impact of project delays on NXT in response to analysts' direct questions. *See, e.g.,* ¶¶86-88-94. In *Avaya,* the Third Circuit held that a complaint sufficiently alleged scienter by pleading that executives denied material problems in close proximity to their

16

eventual disclosure. In that case the plaintiffs alleged that the defendants acted with "conscious or reckless behavior" when discussing "pricing-pressure" with analysts during earnings conference calls. 564 F.3d at 268-69. Specifically, the defendants explicitly denied that the company was engaging in unusual discounting practices that were prevalent in the industry in response to repeated questions about pricing by analysts. *Id.* at 269. The Third Circuit held that even if defendants "were not aware of the full extent of the unusual discounting [in the company], or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors." *Id.* at 270. Importantly, the Third Circuit held in favor of the plaintiffs even though they "[did] not point to any particular document or conversation that would have informed [the defendants] of unusual discounting during the class period." *Id.* at 268–69.

Ninth Circuit courts have also repeatedly held that statements contrary to known information raise an inference of scienter. *See, e.g., Glazer*, 63 F.4th at 773 ("The inference of scienter is bolstered by Plaintiffs' allegations that DeCesare had access to information about the sales pipeline and the status of deals through internal reports and Clari, a revenue platform used to track deals."); *Quality Systems*, 865 F.3d at 1145 ("statements by confidential witnesses establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time the decline in sales"); *Reese v. Malone*, 747 F.3d 557, 576-77 (9th Cir. 2014) ("Johnson's statements were her own very specific representations of the company's findings" which "strongly suggests she had access to the disputed information"), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Thus, *Avaya* and its holding are consistent with the Ninth Circuit's body of case law.

In this case, *Avaya* is directly on point. The Third Circuit cited *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), for the proposition that the "totality of the circumstances" ultimately drives the outcome of the analysis. In *Avaya*, those "circumstances" were largely the context in which the misrepresentations arose, *i.e.*, false answers in direct response to analyst questions (*see* 564 F.3d at 269)—the very same circumstances that occurred here. For example, in

Opposition to Motion to Dismiss                                    No. 5:24-cv-09467-PCP

the Q&A portion of the May 14, 2024 earnings conference call, analysts directly asked Defendants whether they were seeing any elongation of time to convert NXT's backlog into revenue. Defendant Wenger directly denied that this was happening. ¶88. Yet at the same time, Wenger knew or recklessly disregarded that project delays were materially impacting NXT's ability to convert backlog into revenue. Applying *Avaya* to the facts at hand leads directly to a finding in Plaintiffs' favor on the issue of scienter.

**2.     Defendants' Access to Adverse Information Supports an Inference of Scienter**

Scienter is adequately pleaded where, as here, the allegations "'suggest that defendants had actual access to the disputed information.'" *Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at \*2 (9th Cir. Dec. 20, 2024) (quoting *S. Ferry LP, No. 2*, 542 F.3d 786). *See also NVIDIA*, 81 F.4th at 956 ("We have held allegations of scienter adequately pled in cases where the complaint alleged the existence of specific internal information, specific access to that information by the relevant principles, and specific public statements that directly contradict the internal information accessed by the defendants.") (collecting cases); *Stitch Fix*, 2025 WL 1900722, at \*9 (finding scienter where a complaint alleged that a defendant knew negative facts and misrepresented them). The Individual Defendants had direct and constant access to detailed information concerning the material delays that would affect NXT's backlog conversion, giving rise to a strong inference of scienter.

Defendants had three Excel spreadsheets that tracked and captured the most current information on project status, including any delays: (1) "Project Delivery Schedule," which tracks every single piece and part of equipment for each project, with timelines for delivery and installation. ¶44; (2) "Project Dashboard" which shows a higher-level view of the status of equipment delivery to projects and included info about project financials, a running logbook of progress notes about the project, and action items. ¶45; and (3) "Revenue Recognition Forecast" which tracked expected revenue recognition on a weekly basis and is reported to senior leadership. ¶¶53-55. These

18

Opposition to Motion to Dismiss                                         No. 5:24-cv-09467-PCP

spreadsheets were mandatory, updated weekly by project managers, readily accessible, and according to FEs, frequently accessed by senior management, including COO Marco Miller. ¶¶45-47.

Defendants also had an enterprise-wide software system called NetSuite that generated real-time, centralized, reports of the status of revenue recognition for all ongoing projects, including analysis on if revenue recognition was on track with previous quarters and if it is on track with expectations for the current quarter and the year. ¶60. NetSuite gave senior management direct visibility into whether delays were impairing backlog conversion rate. More, even if Individual Defendants, for some reason, failed to utilize NetSuite and the excel spreadsheets, projects delays were directly reported to senior executives in regular management meetings. ¶60.

Former employees at numerous levels, holding titles from assistant project manager to director, all confirmed delays were common and that these delays were routinely reported up the chain and addressed in weekly meetings. FE1, an assistant project manager from 2023 to 2024, explained that project managers had weekly meetings with senior project managers about the projects, including delays and workarounds, and that in turn, the senior project managers reported the delays to senior leadership. ¶43, ¶47. FE2, a project manager from 2024 to 2025, confirmed that reports incorporating those delays were delivered to senior management and discussed in weekly reporting meetings. ¶49, ¶¶50-55. FE3, a senior director from 2016 to 2024 explained that project delays were quickly reported up the chain and addressed in weekly leadership meetings because of their financial significance. ¶¶56-57. FE4, the director of finance from 2018 to 2024, similarly confirmed that permitting, supply, and interconnection delays were a recurring focus of weekly leadership meetings attended by Shugar, Bennett, and other top executives. ¶62-63. With multiple reporting systems, real-time enterprise software, and weekly meeting meetings dedicated to project status, the Individual Defendants cannot credibly to claim ignorance of the project delays and the consequential impairment to backlog conversion. Nevertheless, Defendants repeatedly assured analysts and investors, that although the solar industry faced delays, these headwinds have little impact on NXT because of its large volume of backlogs.

19

Defendants attempt to discredit Plaintiffs' confidential witnesses by relying on mischaracterizations of their allegations and ignoring controlling precedent. But each FE (each identified by their job title, tenure, and responsibilities), provides corroborated and particularized facts based on their personal knowledge that indicate the Individual Defendants' scienter, in this case by establishing that senior management, including the Individual Defendants, had access to and were repeatedly informed of the delays impairing NXT's backlog conversion and revenue recognition. These allegations satisfy this Court's standard for reliance for confidential witnesses as set forth in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). More, the FEs corroborate each other, and their information combines with public information to form a consistent set of alleged facts. *See Quality Systems*, 865 F.3d at 1145 ("[t]aken collectively, statements by confidential witnesses establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time the [operational problems] during the Class Period"); *In re Gilead Sciences Sec. Litig.*, 2009 WL 3320492, at *2 (N.D.Cal. Oct. 13, 2019) (underlying fraud sufficiently alleged where confidential witnesses' allegations were combined); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (rather than scrutinizing each FE's statements in isolation, the Court should draw inferences from all sources cited in the Complaint, including "public sources" and "corroboration furnished by… confidential witness accounts."). That some FEs lacked direct contact with the individual defendants does not render their accounts immaterial, so long as they show that senior executives routinely received the information at issue. *See Alphabet*, 1 F.4th at 706 (plaintiffs adequately alleged scienter based on "strong inference" that defendant received adverse information about "Privacy Bug" even though complaint did not contain allegations of direct communication); *S. Ferry LP, No. 2*, 542 F.3d at785-86 (allegations satisfied PSLRA standard for scienter where "it would be 'absurd' to suggest that management was without knowledge of the matter"). *See also Grae v. Corr. Corp. of Am.,* 2017 WL 6442145, at *20 & n.8 (M.D. Tenn. Dec. 18, 2017) (scienter where witness "confirm[ed] that ... the ongoing QAD tracking included the results of [Bureau of Prisons] audits and Notices of Concern and ... [defendants] were among the senior executives who routinely received QAD information,"

Opposition to Motion to Dismiss                                    No. 5:24-cv-09467-PCP

notwithstanding that witness did "not claim[] to have spoken directly to any of the Individual Defendants"); *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 526 (D. Md. 2022) ("A [confidential witness] report that the senior company official making public statements remained abreast of the relevant issues is probative on the issue of scienter."); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (scienter where concealed facts "were widely and regularly discussed on weekly conference calls").

Defendants' contention that FE1 offers only "vague" allegations and lacks personal knowledge of what Shugar or others actually knew, Defs. Br. at 21-22, misrepresents the Complaint. FE1 explained in detail that delays were recorded in mandatory reports, such as the Project Dashboard, and escalated up the chain to senior leadership. ¶¶43-48. FE1 also confirmed that COO Miller accessed these reports frequently and that the data was available to other executives, including Shugar. ¶¶43-48. Courts have repeatedly held that such allegations, that executives had access to, and used, reporting systems tracking operational problems in real time, are sufficient to plead scienter. *Quality Systems*, 865 F.3d at 1145. The court does not require confidential witnesses to have direct contact with individual defendants to establish that "members of executive-level management, including [I]ndividual [D]efendants, had access to and used reports documenting in real time the" project delays during the Class Period. *See id.* at 1145.

Defendants argue that FE2's allegations are irrelevant because he joined the Company after the alleged misstatements and never mentions Individual Defendants. Defs. Br. at 22-23. That is, again, incorrect. FE2 confirmed that delays were prevalent across multiple projects throughout the relevant time period and that these delays were systematically incorporated into the NXT's reporting structures, including the Project Dashboard and Revenue Recognition Forecasts. ¶¶49-55. FE2 also explained that the reports capturing these delays were routinely, consistently delivered to senior management and discussed in weekly reporting meetings, showing how the reporting systems functioned in practice and how information flowed up to the top of NXT. *Id.* The fact that FE2 collaborated directly on preparing and delivering these reports demonstrates the continuity of reporting mechanisms in place during and after the Class Period. Courts have consistently held that

21

class period dates do not restrict the universe of relevant or probative facts; information from before or after the period may shed light on defendants' knowledge during it. *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005). *See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (post-class period information can show what was known by defendants at earlier dates). FE2's description of NXT's structured reporting system and the persistence of project delays corroborates that the Individual Defendants routinely had access to the same type of information during the Class Period, making their denials to investors implausible and supporting an inference of their fraudulent intent.

Defendants contend that FE3's statement regarding project delays is vague and lacks specificity as to which projects, timeframes, or financial impacts. Defs. Br. at 23-24. FE3, who served as a senior director at NXT for more than eight years, explained that delays were significant, recurring, and systematically captured in the Project Dashboard and other reports that were reviewed at weekly leadership meetings because of their financial consequences. ¶¶56-58. In describing how delays were tracked, escalated, and addressed, FE3 corroborates both the continuity and centrality of the Company's reporting system, showing there was no change to the reporting structure at NXT, both before and during the Class Period, which adds to the inference that Individual Defendants, had access to and used reports documenting in real time the project delays during the Class Period.

Defendants dismiss FE4's testimony as generic and lacking details in regard to meetings and alleged delays. Defs. Br. at 23-24. FE4, NXT's Director of Finance, confirmed that permitting, supply, and interconnection delays were a recurring focus of weekly leadership meetings attended by Shugar, Bennett, and other top executives. ¶¶62-63. Courts have consistently held that CWs need not allege direct contact with defendants where their testimony establishes that senior executives routinely received reports about the concealed problems. *See Alphabet,* 1 F.4th at 706. FE4's testimony directly ties the concealed delays to the very executives who misrepresented backlog conversion, further supporting a strong inference of scienter.

22

Opposition to Motion to Dismiss                                              No. 5:24-cv-09467-PCP

Defendants similarly dismiss Former Employee 5's ("FE5")[3] account as untimely because FE5 left NXT before the challenged statements and because FE5 did not specifically mention the Individual Defendants. Again, the fact that confidential witnesses lack direct contact with the individual defendants does not render their accounts immaterial, so long as they show that senior executives routinely received the information at issue. *Alphabet,* 1 F.4th at 706. FE5 corroborated the reporting structure at NXT, and confirmed that there was no change to the reporting structure at NXT. ¶¶65-66. FE5's information supports the inference that Individual Defendants had access to and used reports documenting in real time project delays during the Class Period.

### 3.    Defendants Misled Investors Concerning Core Operations, Supporting an Inference of Scienter

The closer an alleged misstatement is to a "core operation" or "key product," the more reasonable it is to infer that senior management knew or should have known it was misleading when made—and especially when accompanied by detailed allegations about management's exposure to factual information. *S. Ferry LP, No. 2*, 542 F.3d at 785-86. *See also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9–10 (1st Cir. 2021) (applying "core operations" doctrine when holding "complaint alleges facts raising a strong inference that Ali and Folger either inquired about VME before deciding to promote it to investors or were reckless in failing to do so"); *Stitch Fix*, 2025 WL 1900722, at *9 (plaintiffs pled that a product line was so important to the parent company's business that it would be implausible to conclude that senior executives did not know about its problems); *Longo v. OSI Systems, Inc.*, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) (plaintiffs sufficiently alleged scienter through a core operations theory).

Defendants had multiple ways to track backlog conversion and project installation, including weekly reports from employees, real-time reports from enterprise-wide software, and regular meetings. The very subject of these reports was fundamental to NXT, thereby further suggesting that Defendants knew or were deliberately reckless in not being aware of the project delays. For investors and analysts in particular, the timing of NXT's backlog conversion and project installations was a

---

[3] FE5 was a project manager at NXT from October 2023 to January 2024. ¶64.

23

critical metric for evaluating success. That is why this information was not a peripheral matter but rather a key metric for investors and analysts when evaluating the Company's core operations. The core importance of revenue recognition to NXT's business, paired with Defendants' exposure to project status, including weekly reports from employees, real-time reports from enterprise-wide software, and regular meetings, supports the inference that Defendants knew or were deliberately reckless in not being aware of delays in the Company's projects and their impact. *S. Ferry LP, No. 2*, 542 F.3d at 785-86. It further combines with the temporal proximity of the Individual Defendants' denials of the impact of project delays to those ongoing impacts to even more strongly support a scienter inference. *Avaya*, 564 F.3d at 271-272.

The problems of delays impairing revenue recognition were not unique to NXT but rather prevalent in the entire solar industry. Array, one of NXT's largest competitors, publicly disclosed it was significantly impacted by such delays. ¶73. Instead of acknowledging that NXT faced the same headwinds, Defendants sought to distinguish NXT by repeatedly emphasizing the size of its backlog and asserting that delays had "little impact." Their pattern of raising guidance for three consecutive quarters, touting about backlog growth, and explicitly denying any elongation in the time required to convert backlog into revenue, were not innocent mistakes. They were a calculated effort to set NXT apart from competitors and mislead analysts and investors into believing NXT was uniquely insulated from industry-wide headwinds when really, it faced the same problems.

**D.    The Complaint Sufficiently Pleads Control Person Liability**

Because the Complaint adequately alleges a primary violation of §10(b) and Rule 10b-5 and the Individual Defendants controlled NXT, Plaintiffs have alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)

24

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[4]

DATED:  September 30, 2025

Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone:(215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
          lheifetz@rosenlegal.com

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone:(213) 785-2610
Facsimile: (213) 226-4684
Email:  lrosen@rosenlegal.com

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

-and-

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671

*Attorneys for Plaintiffs*
*and Additional Counsel for the Class*

---

[4] Plaintiffs respectfully request leave to amend the pleadings if any aspect of the Complaint is dismissed. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

25