IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


WEBER,                                    )   CV-24-9467-PCP
                                          )
                    PLAINTIFF,            )   SAN JOSE, CALIFORNIA
                                          )
                    VS.                    )   DECEMBER 4, 2025
                                          )
NEXTRACKER, INC., ET AL,                  )   PAGES 1 - 31
                                          )
                    DEFENDANTS.            )
                                          )
_____     )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE P. CASEY PITTS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFF:      THE ROSEN LAW FIRM, P.A.
                        101 GREENWOOD AVENUE, STE 440
                        JENKINTOWN, PA 19046
                   BY:  **LEAH HEIFETZ-LI**


FOR THE DEFENDANT:      ORRICK HERRINGTON & SUTCLIFFE, LLP
                        405 HOWARD STREET
                        SAN FRANCISCO, CA 94105
                   BY:  **JAMES NEIL KRAMER**
                        **ALEX K. TALARIDES**




OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                             CERTIFICATE NUMBER 13185


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER


UNITED STATES COURT REPORTERS

SAN JOSE, CALIFORNIA                    DECEMBER 4, 2025

P R O C E E D I N G S

(COURT CONVENED AT 10:38 A.M.)

THE CLERK:  CALLING OUR NEXT MATTER THIS MORNING, 24-CV-9467.  WEBER V.  NEXTRACKER, INC., ET AL.  ON TODAY FOR THE MOTION TO DISMISS.

WILL THE PARTIES PLEASE APPROACH AND STATE YOUR APPEARANCES FOR THE RECORD BEGINNING WITH PLAINTIFF'S COUNSEL.

MS. HEIFETZ-LI:  GOOD MORNING, YOUR HONOR.

LEAH HEIFETZ-LI, THE ROSEN LAW FIRM, FOR LEAD PLAINTIFF.

THE COURT:  GOOD MORNING.

MR. KRAMER:  GOOD MORNING, YOUR HONOR.

JAMES KRAMER FROM ORRICK HERRINGTON & SUTCLIFFE.  WITH ME TODAY ARE MY PARTNER, ALEX TALARIDES, AND FROM THE COMPANY WE HAVE BRUCE LEDESMA, WHO IS THE CHIEF LEGAL OFFICER AND DAVID BOHRER WHO IS THE HEAD OF LITIGATION.

THE COURT:  GOOD MORNING.

SO WE ARE HERE ON NEXTRACKER'S MOTION TO DISMISS, SO I WILL HEAR FROM NEXTRACKER FIRST AND THEN I WILL GIVE PLAINTIFFS AN OPPORTUNITY TO RESPOND.

MR. KRAMER:  GREAT YOUR HONOR.

AND YOUR HONOR, I HAVE PREPARED REMARKS, OF COURSE IF THERE ARE SPECIFIC ISSUES YOU WANT ME TO ADDRESS OUT OF THE GATE, I'M HAPPY TO FOCUS ON THOSE, OTHERWISE I WILL JUST GET STARTED AND YOU CAN JUMP IN ALONG THE WAY.

THE COURT:  WHICH IS WHAT I USUALLY DO.  SO WHY DON'T YOU GET STARTED AND I WILL PROBABLY INTERRUPT.

MR. KRAMER:  YOUR HONOR, JIM KRAMER FOR DEFENDANTS.

I'M LOOKING FORWARD TO DISCUSSING THE PLEADING STANDARDS UNDER THE PSLRA, BUT BEFORE I GET THERE I WANT TO START WITH A DIFFERENT PLACE WHICH IS WHY THIS ENTIRE THEORY OF THE COMPLAINT IS NOT PLAUSIBLE UNDER RULE 8(A).

AND I WANT TO LEVEL SET ON A COMPANY THINGS.  SO FIRST, THE COMPANY, AS YOU SAW FROM THE PAPERS, IS IN THE SOLAR TRACKER BUSINESS WHERE THEY PROVIDE SOLAR TRACKERS FOR LARGE SCALE UTILITY COMPANIES.  SO BASICALLY WHEN YOU ARE BUILDING A SOLAR PROGRAM, A SOLAR PLANT, THE PANELS GO ON THE NEXTRACKER SYSTEM AND NEXTRACKER ALLOWS THOSE PANELS TO BASICALLY FOLLOW THE SUN AND CREATE GREATER EFFICACY.

SO AS ALLEGED IN THE AMENDED COMPLAINT, WHEN NEXTRACKER SIGNS A CONTRACT, THAT CONTRACT GOES IN THE BACKGROUND, IT DOES NOT GO INTO REVENUE, IT DOESN'T CONVERT TO REVENUE UNTIL THE ACTUAL PRODUCT IS DELIVERED TO THE PROJECT.

AND THERE ARE A NUMBER OF FACTORS THAT ARE QUITE FRANKLY OUT OF NEXTRACKER'S CONTROL AS TO THE TIMING OF WHEN BACKLOG CAN CONVERT, BECAUSE WE ARE LITERALLY AT THE MERCY OF THE PROJECT ITSELF, THERE CAN BE INTERCONNECT DELAYS, THERE CAN BE OTHER DELAYS IN THE CONSTRUCTION MORE GENERALLY.

NOW THROUGHOUT THE CLASS PERIOD, NEXTRACKER DISCLOSED THAT WE WERE SUBJECT TO THESE DELAYS AND MADE A NUMBER OF STATEMENTS

ABOUT THE EXISTENCE OF THESE DELAYS AND THE FACT THAT OUR GROWTH CREATED TAILWINDS THAT OFFSET THESE DELAYS.

NOW PLAINTIFF'S CORE THEORY OF THE COMPLAINT WHICH IS IN PARAGRAPH 2 AND 83 OF THE AMENDED COMPLAINT IS THAT "DEFENDANTS CONTINUED MINIMIZING THE IMPACT OF PROJECT DELAYS AND ITS FINANCIAL RESULTS."

AND ACCORDING TO PLAINTIFFS, THE TRUTH OF THE REVEALED AFTER THE MARKET CLOSED JULY 31ST WHEN NEXTRACKER'S Q1 RESULTS EXCEEDED GUIDANCE FROM THE FIRST QUARTER, AND IT REAFFIRMED RATHER THAN RAISED ITS GUIDANCE.  THAT IS THE PREMISE OF THE COMPLAINT, THAT IS THE MOMENT THAT TRIGGERED THE COMPLAINT.

NOW YOUR HONOR, THAT ENTIRE THEORY OF FRAUD THAT THE COMPANY COMMITTED FRAUD ON THE MARKET WHEN IT EXCEEDED ITS PREVIOUSLY PROVIDED GUIDANCE BUT DIDN'T RAISE IT, IS COMPLETELY NONSENSICAL.  IN PARAGRAPH 98 OF THE COMPLAINT, THE PLAINTIFFS THEMSELVES SPECIFICALLY ALLEGE THAT WE -- THAT THE COMPANY INCLUDED PROJECT DELAYS IN ITS FORECAST.  IT SPECIFICALLY ALLEGES IT.

AND WHAT THEY ALLEGE IS THAT NEXTRACKER DID NOT CHANGE HAS FOUR-YEAR GUIDANCE, HOWEVER REFLECTS THAT ITS EXECUTIVES HAD ALREADY INCORPORATED THESE MATERIAL PROJECT DELAYS INTO ITS FORECAST.

WELL YOUR HONOR, IF WE ALREADY INCORPORATED THEM IN OUR FORECAST AND WE EXCEEDED THE FORECAST, HOW COULD THAT HAVE BEEN FRAUD?  THAT WHOLE THEORY OF FRAUD IS JUST NOT POSSIBLE.

AND OF COURSE, YOUR HONOR, IN ADDITION TO EXCEEDING THE GUIDANCE, THE COMPANY ACTUALLY AGAIN, THROUGHOUT THE CLASS PERIOD, COMPLETELY AND FULLY DISCLOSED THE FACT THAT THEY WERE SUBJECT TO THESE DELAYS.

THE COURT:  LET ME ASK YOU A QUESTION ON THIS, AND I THINK YOUR POSITION IS THAT WOULDN'T BE THE CASE HERE, BUT COULD THERE BE THE CIRCUMSTANCE WHERE A COMPANY'S REPRESENTATIONS, AFFIRMATIVE REPRESENTATIONS SAY, GAVE INVESTORS THE REASONABLE EXPECTATION THAT THEIR INITIAL GUIDANCE WAS ALWAYS GOING TO BE INCREDIBLY UNDERESTIMATED AND THAT THERE WOULD A REASONABLE EXPECTATION ON THE MARKET THAT BASED ON BEST PRACTICE AND ANY AFFIRMATIVE REPRESENTATION -- PERHAPS AFFIRMATIVE REPRESENTATIONS ABOUT THE COMPANY'S PRACTICES -- THAT GUIDANCES WOULD BE INCREASED AND IN SUCH THAT THE FAILURE TO INCREASE HERE COULD PERHAPS GIVE RISE TO A CLAIM.

IF WE HAD THOSE FACTS, WOULD THAT POTENTIALLY GIVE THEM A STRONGER CLAIM?

MR. KRAMER:  IT WOULDN'T, YOUR HONOR, BECAUSE UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT, THE STARTING POINT FOR FRAUD IS A MISSTATEMENT OR OMISSION.

SO WHAT WOULD BE THE POSSIBLE MISSTATEMENT BE?  IF YOU SAY THIS IS WHAT OUR GUIDANCE IS, THIS IS WHAT OUR FORECAST IS --

THE COURT:  WHAT IF YOU SAY OUR APPROACH TO OUR INITIAL GUIDANCE FORECASTING IS ALWAYS GOING TO BE -- IS GOING

TO BE AN APPROACH THAT IS GOING TO RESULT IN SOMETHING THAT IS LIKE 50 PERCENT BELOW WHAT IS THE -- ALMOST CERTAIN TO BE THE ACTUAL GUIDANCE AS WE UPDATE THEM.

MR. KRAMER:  SO IN THAT SCENARIO, THAT'S THE MISSTATEMENT.  WHEN YOU SAY OUR GUIDANCE IS ALWAYS 50 PERCENT OF WHAT WE ACTUALLY EXPECT, THAT'S GOING TO BE THE MISSTATEMENT.  AND UNDER THE PSLRA, YOU NEED FACTS ALLEGED THAT AT THE TIME YOU MADE THAT, IT WAS FALSE AND MADE WITH THE INTENT TO DEFRAUD.  YOU TO HAVE THAT STILL TIED TO A MISSTATEMENT.

REMEMBER THE SUPREME COURT HAS SAID 10(B)(5), YOU NEED A MISSTATEMENT, YOU HAVE TO BE ADVERSE FACTS AT THE TIME, AND YOU HAVE TO BE MADE WITH THE INTENT TO DEFRAUD.

MARKET EXPECTATION IS NOT FRAUD, RIGHT.  AND IF IT WAS, YOUR HONOR, THEN WHAT WOULD COMPANIES DO?  WHY WOULD YOU GIVE GUIDANCE, RIGHT?

I MEAN HONESTLY, AS A LAWYER WHO HAS BEEN DEFENDING THESE CASES IN THE VALLEY FOR A LITTLE WHILE, I'M VERY WORRIED THAT THIS THEORY OF FRAUD IS KIND OF A NEW PLACE, A NEW VISTA FOR THE PLAINTIFFS.  BECAUSE AGAIN, THE COMPANY SAYS HERE'S WHAT WE THINK IS GOING TO HAPPEN, THEY EXCEED IT, AND TO BRING SUIT FOR FRAUD.

SO THAT'S JUST FROM A PLAUSIBILITY PERSPECTIVE, BUT WE CAN MOVE BEYOND THAT, YOUR HONOR, AND RESPECTFULLY, I THINK WE SHOULD TALK ABOUT SPECIFIC FACTS THAT NEED TO BE PLED.  AND I

KNOW THE COURT IS WELL AWARE OF THE PLEADING STANDARDS IN THESE CASES, I HAVE READ ALL OF YOUR PRIOR DECISIONS, PLAINTIFFS HAVE TO ALLEGE SPECIFIC FACTS AT THE TIME THAT WE MADE THE STATEMENT, THEY WERE FALSE, AND THEN OF COURSE FACTS THAT ESTABLISH A STRONG INFERENCE OF SCIENTER, THAT IS MORE COGENT AND COMPELLING THAN THE INNOCENT INFERENCES.

HERE WE HAVE NO FACTS, RIGHT, THE ALLEGED MISSTATEMENTS WERE MADE IN THREE DIFFERENT MOMENTS.  THEY WERE MADE DURING THE COMPANY'S EARNINGS CALL ON MAY 14, 2024 -- AND I SHOULD POINT OUT, YOUR HONOR, ALL OF THESE DOCUMENTS ARE IN FRONT OF THE COURT, THERE'S BEEN NO OBJECTION TO THE JUDICIAL NOTICE, EVERYTHING IS IN FRONT OF THE COURT.  BUT THE MISSTATEMENTS ARISE OUT OF THE EARNINGS CALL, THE FORM 10-K, THE RISK FACTORS, AND THEN OF COURSE THE JP MORGAN CONFERENCE.

THE STATEMENTS RELATING TO THE COMPANY'S EARNINGS CALL, MAY 14TH, PLAINTIFFS ATTACK A NUMBER OF STATEMENTS TOUTING OUR RESULTS, WHICH AS WE POINT OUT A NUMBER OF THEM ARE PURE PUFFERY.  BUT THE STATEMENTS ABOUT THE RESULTS, THERE'S NO FACTS ALLEGED TO ESTABLISH THAT ANY OF THEM WERE FALSELY MADE. OUR RESULTS WERE OUR RESULTS, OUR RESULTS WERE NOT MISSTATED, THERE WERE NO FACTS ALLEGED TO ESTABLISH THEY WERE FALSE WHEN MADE.

AND THEN OF COURSE THE FORECAST WE GAVE FOR THE NEXT QUARTER WAS WE WERE GOING TO BE UP 25 TO 30 PERCENT YEAR OVER YEAR.  AND AS THE COURT KNOWS, IF YOU LOOK AT DOCUMENT 54-6 AT

PAGE 3, IN FACT WE CAME IN 50 PERCENT UP YEAR OVER YEAR.

THERE IS A CHART, THIS IS THE EARNINGS RELEASE, AND YOU CAN SEE THAT WE ARE UP 50 PERCENT YEAR OVER YEAR WHEN WE PROJECTED A RANGE OF 25 TO 30 PERCENT.

AND OF COURSE WE MADE THAT PROJECTION, WE PROJECTED THAT HEY, WE ARE TRYING TO TAKE INTO ACCOUNT PROJECT DELAYS, WE DON'T KNOW WHERE WE ARE GOING TO END UP, WE HAVE A RISK FACTOR THAT SAYS OUR RESULTS CAN BE TO BE LUMPY, THEY CAN BE ERRATIC, SO IT'S JUST AN ESTIMATE.

AND YOUR HONOR, THERE'S JUST NOTHING SPECIFIC ALLEGED THAT ANY OF THOSE STATEMENTS WERE FALSELY MADE.

THE PLAINTIFFS RELY ON FORMER EMPLOYEES, AND THEY HAVE FIVE OF THEM, WHAT THE FORMER EMPLOYEES DO, AND I KNOW YOU HAVE BEEN THROUGH FORMER EMPLOYEES BEFORE, IS THEY SAY WELL DEFENDANTS HAD ACCESS TO INFORMATION ABOUT DELAYS.

ABSOLUTELY THEY DID BECAUSE WE HAD TO TRACK DELAYS IN ORDER TO DO OUR FORECAST.  BUT THAT'S NOT WHAT THIS CASE IS ABOUT, THE CASE ISN'T ABOUT WERE THE DEFENDANTS AWARE OF DELAYS, THE CASE IS ABOUT WERE DEFENDANTS AWARE OF THE MAGNITUDE OF THE IMPACT OF DELAYS ON THE BUSINESS AND DID WE MISREPRESENT IT?  THAT'S WHAT THE CASE IS ABOUT.

AND NOT ONE OF THE FORMER EMPLOYEES, EVEN PUTTING ASIDE THE FACT THAT WE EXCEEDED GUIDANCE, NOT ONE FORMER EMPLOYEE SAYS THAT ANY OF OUR STATEMENTS MISREPRESENTED THE IMPACT OF DELAYS ON OUR BUSINESS.  THERE ARE SOME EMPLOYEES THAT SAY,

WELL SOME PROJECTS SLIPPED.  BUT REMEMBER, OUR STATEMENT TO THE MARKET WAS THAT BACKLOG CONVERTS TO REVENUE IN TWO TO 8 QUARTERS.  OF COURSE THINGS MOVE, THAT'S NOT THE ISSUE, THE ISSUE IS DID WE MISREPRESENT THE IMPACT ON OUR BUSINESS?  AND YOUR HONOR, THEY DON'T HAVE ANYTHING THERE.

IF WE MOVE FORWARD TO THE RISK FACTORS, THE PLAINTIFFS ATTACK A COUPLE RISK FACTORS IN OUR FORM 10-K, AGAIN THESE ARE DOCKET 54-2, AND WHAT THEY ARGUE IS WELL, YOU KNOW, THE DISCLOSURES WERE FALSE BECAUSE DELAYS HAVE ALREADY HAD A MATERIAL IMPACT ON YOUR BUSINESS.

WELL AGAIN, THERE'S NO FACTS TO ESTABLISH THAT WHATSOEVER. AND IT'S JUST NOT PLAUSIBLE BECAUSE WE WERE WELL ABOVE EXPECTATION.  SO HOW CAN YOU ARGUE THAT YOUR RISK FACTORS WERE FALSE?  AND OF COURSE THAT RISK FACTOR IS PROVIDED IN THE MIDDLE OF THE CLASS PERIOD.  FIVE WEEKS LATER WE ANNOUNCE RESULTS THAT WERE WELL ABOVE THE OUR EXPECTATION, SO THERE'S JUST NOTHING THERE TO ESTABLISH FALSITY.

AND ARGUING THAT THE RISK FACTORS ARE MISLEADING AS A MATTER OF LAW ALSO DOESN'T WORK, YOUR HONOR.  UNDER THE TORRID CASE, AS I'M SURE THE COURT IS AWARE, IF A RISK CONCERNS SOMETHING THAT'S INHERENT IN RUNNING THE BUSINESS, THAT'S NOT ACTIONABLE, YOU HAVE TO SHOW THAT THE RISK MATERIALLY IMPACTED THE BUSINESS.  IN OTHER WORDS, YOUR HONOR, IF THE SIGNIFICANT OF THE RISK IS NOT YES OR NO, BUT MAGNITUDE, THE RISK FACTOR CAN'T BE MISLEADING AS A MATTER OF LAW.

AND AS WE COMPLETELY DISCLOSED THROUGHOUT THE CLASS PERIOD, WE WERE SUBJECT TO THESE HEADWINDS, WE WERE SUBJECT TO PROJECT DELAYS.

AND IF THE COURT LOOKS AT FOOTNOTE 4 OF OUR OPENING BRIEF, YOU WILL SEE WE CAPTURED SOME OF THE PLACES WHERE WE TALKED ABOUT THESE RISKS.  AND I'M JUST GOING TO HIGHLIGHT A COUPLE OF THEM HERE.  AMENDED COMPLAINT, PARAGRAPH 69, WHICH WAS THE COMPANY'S FIRST EARNINGS CALL AS A PUBLIC COMPANY, AND THE COMPANY IDENTIFIED DURING THAT CALL, INTERCONNECT AND PERMITTING DELAYS AS BARRIERS TO CONVERTING BACKLOG TO REVENUE AS HEADWINDS.  AND AGAIN, THESE ARE WHAT THE PLAINTIFFS ALLEGE.

PARAGRAPH 70, A RESPONSE TO AN ANALYST QUESTION, MR. SHUGAR SAID THAT THE TIME TO OBTAIN PERMITS ON PROJECTS HAD INCREASED AND "WAS A FACTOR IMPACTING THE COMPANY."

PARAGRAPHS 71 AND 72, INTERCONNECT ISSUES DELAYED INDIVIDUAL NEXTRACKER PROJECTS IN THE UNITED STATES.

PARAGRAPH 74, MR. BENNETT, WHEN TALKING ABOUT INTERCONNECT DELAY HEADWINDS SAID THEY ARE REAL, WE SEE TAILWINDS SIGNIFICANTLY STRONGER THAN THE HEADWINDS.

PARAGRAPH 75, MR. SHUGAR TALKS ABOUT THE U.S. BUSINESS SEEING MULTIPLE HEADWINDS.

PARAGRAPH 80, THE SAME.

AND OF COURSE PARAGRAPH 98, PLAINTIFF'S OWN ALLEGATIONS THAT WE INCORPORATED THESE HEADWINDS INTO OUR GUIDANCE THAT WE PROVIDED AND EXCEEDED.

SO THERE'S NOTHING ON FALSITY WHATSOEVER, THE CONFIDENTIAL WITNESSES DON'T GET THEM THERE, IT'S ABOUT MAGNITUDE, THEY JUST DON'T HAVE ANYTHING.

BUT LET'S TALK ABOUT SCIENTER, YOUR HONOR, BECAUSE THAT'S ANOTHER PLACE WHERE HONESTLY THERE IS NO EFFORT.  THE COMPLAINT DOESN'T EVEN INCLUDE A SECTION ON SCIENTER.  IT'S NOT IN THE COMPLAINT, INSTEAD THEY HAVE GOT THESE FORMER EMPLOYEES, NONE OF WHOM OFFER ANY INSIGHT INTO THE INDIVIDUAL DEFENDANT'S STATE OF MIND.  AGAIN, ALL THEY SAY IS FOLKS WERE TRACKING THE DELAYS IN PROJECTS, WHICH OF COURSE WE HAVE TO, IT'S NORMAL IN RUNNING THE BUSINESS.

AND HONESTLY, YOUR HONOR, THERE IS NO COMPELLING THEORY OF FRAUD.  THERE IS NO STOCK SALES ALLEGED, THERE'S NO REASON WHY WE WOULD LIE TO THE MARKET, IT'S JUST COMPLETELY DEVOID OF THEORY OF FRAUD.  AND YOUR HONOR, IN THIS SITUATION WHERE THERE IS NO COMPELLING THEORY OF FRAUD, THAT'S AN INDEPENDENT BASIS TO DISMISS THIS.  WHY WOULD WE SUPPOSEDLY LIE TO THE MARKET?

THE COURT:  WELL I MEAN, THE QUESTION I HAVE IS I MEAN, IS THERE A NEED AT THIS POINT TO, IF I AGREE WITH YOU ON THE ABSENCE OF A MISSTATEMENT, IS THERE ANY NEED TO ADDRESS THE SCIENTER ISSUES?

MR. KRAMER:  SO I THINK YES, YOUR HONOR, AND HERE'S WHY:

IF YOU ARE GOING TO GIVE THEM LEAVE TO AMEND, IT'S MUCH MORE EFFICIENT TO ADDRESS BOTH THE FALSITY AND SCIENTER ISSUES

NOW BECAUSE THEN IT'S CLEAR WHAT THEY NEED TO ADDRESS.

THE COURT:  THE THING THAT I'M STRUGGLING A LITTLE BIT WITH, AND I WILL CERTAINLY TALK TO PLAINTIFF ABOUT, IS THERE'S A CLOSE RELATIONSHIP HERE IN UNDERSTANDING WHAT THE FRAUD ON THE MARKET WAS AND WHAT THE NONDISCLOSURE WAS AND IF THERE WAS SCIENTER AS TO THAT.

TO BE FRANK, I MIGHT -- THE EMPLOYEE TESTIMONY, IF IT WAS IN A VERY CLEAR "THIS WAS THE THING THAT WASN'T DISCLOSED AND THIS IS THE THING THAT" -- AND YOU KNOW, AND THEY KNEW THAT, IT WAS, SAY, THAT THE NORMAL -- THEY HAD REPRESENTED TO THE MARKET THAT IT WAS -- FIVE PERCENT OF PROJECTS WERE DELAYED, AND THERE IS NOW THIS TESTIMONY THAT 20 PERCENT OF PROJECTS WERE DELAYED.

THERE ARE SOME CHALLENGES TO WHEN THEY WERE THERE AND THE CIRCUMSTANTIAL CHALLENGES, BUT THAT MIGHT VERY WELL BE SUFFICIENT TO PLEAD SCIENTER AS TO THAT, AS TO KNOWLEDGE OF THAT ACTUALLY THERE WAS A FOUR TIMES INCREASE IN THE NUMBER OF DELAYS DURING THIS TIME PERIOD.  BUT THAT IN THE ABSENCE, WHEN THERE IS SORT OF AN AMORPHOUSNESS TO THE QUESTION OF WHAT WAS KNOWN OR NOT DISCLOSED IN THE FIRST PART OR WHAT WAS NOT DISCLOSED IN THAT FIRST PART, IT'S HARD TO GET INTO THE QUESTION OF WHETHER THE FORMER EMPLOYEE TESTIMONY IS SUFFICIENT.

MR. KRAMER:  I UNDERSTOOD THE POINTS, YOUR HONOR, BUT LET ME SAY THIS:  THE STATEMENT DURING THE CLASS PERIOD IS WE TYPICALLY SEE BACKLOG CONVERT TO REVENUE IN TWO TO 8 QUARTERS,

THAT'S A STATEMENT, NO FACTS ALLEGED THAT THAT WAS FALSE.

AT THE END OF THE CLASS PERIOD.

THE COURT:  I THINK THEY SAY TWO QUARTERS, GENERALLY TWO TO FIVE.  THERE IS A MODIFICATION, IT'S GENERALLY TWO TO FIVE.

MR. KRAMER:  FAIR ENOUGH, YOUR HONOR, SO THAT'S A STATEMENT.  AT THE END OF THE CLASS PERIOD WHEN WE ANNOUNCE THE RESULTS DURING ANALYST -- WHEN ASKED ABOUT AN ANALYST, DEFENDANTS SAY IT'S ACTUALLY WE ARE SEEING MORE TOWARDS THE EIGHT-MONTH, RIGHT.

THERE'S NOTHING ALLEGED BY ANY FORMER EMPLOYEE OR FACTS TO SUGGEST THAT THAT STATE OF AFFAIRS EXISTED DURING THE QUARTER. AND IN FACT, YOUR HONOR, REMEMBER PARAGRAPH 98, DEFENDANTS INCORPORATED THEIR VIEW OF PROJECT DELAYS INTO THE FORECAST.

SO THEY'VE GOT TO DROP PARAGRAPH 98 FROM THE COMPLAINT, THEY HAVE TO COME UP WITH SOME THEORY WE DID NOT INCORPORATE OUR BEST ESTIMATORS INTO OUR FORECAST OR THEIR THEORY IS NOT VIABLE.

BUT AGAIN, YOUR HONOR, THE FORMER EMPLOYEES DO NOTHING. FE-5 WHO WAS AT THE COMPANY FOR EIGHT YEARS, THIS IS THE POINT YOUR HONOR MADE, WE SAID EIGHT YEARS, HOW MUCH OF FE-5'S OBSERVATIONS ARE DURING THE CLASS PERIOD OR BEFORE?  FE-5 SAYS, WELL I THINK 20 PERCENT OF PROJECTS WERE DELAYED.  OKAY.  THAT MEANS 80 PERCENT WERE NOT.  NONE OF THAT SPEAKS TO THE TIMING.

SO YOUR HONOR, MY POINT IS I THINK THEY FUNDAMENTALLY

FAILED AS A MATTER OF PLAUSIBILITY.  YOU CAN'T SAY THAT WE MISREPRESENTED THE IMPACT OF PROJECT DELAYS WHEN WE EXCEEDED GUIDANCE.  IT FAILS AS A MATTER OF 9(B) AND THE PSLRA BECAUSE THERE'S NO FACTS TO ESTABLISH THAT ANY OF THE STATEMENTS MADE WERE FALSE AT THE TIME AND IT FAILS BECAUSE THERE'S NO PLEADING AT ALL TO TRY TO ESTABLISH SCIENTER, AND IT'S NOT EVEN A COGENT THEORY OF SCIENTER.

SO I DO THINK THIS CASE SHOULD BE DISMISSED AND I DO THINK THAT THE COURT SHOULD ADDRESS BOTH FALSITY AND SCIENTER BECAUSE ON THE AMENDED COMPLAINT, PLAINTIFFS NEED TO KNOW THAT IF THEY DON'T DO SOMETHING ON SCIENTER, YOU ARE GOING TO DISMISS IT AGAIN.  AND I WANT TO BE SURE THAT IF THEY WANT TO TAKE THIS TO THE NINTH CIRCUIT THEN I THINK WE NEED TO BE IN A PLACE WHERE THEY HAVE DONE THAT.

BUT HERE'S THE OTHER THING I WOULD SAY, YOUR HONOR, IF YOU ARE CONSIDERING GIVING LEAVE TO AMEND, COUNSEL SHOULD BE ABLE TO EXPLAIN TO YOU HOW THEY WOULD FIX IT, GIVE YOU SOME SENSE, BECAUSE THESE CASES COST A LOT OF MONEY, RIGHT, THEY COST A LOT OF MONEY TO DEFEND, THEY ARE DISTRACTING, AND SO THERE SHOULD BE SOME DISCUSSION OR SOME PROFFER, HERE'S HOW I WOULD CHANGE THIS THEORY, BECAUSE THIS ONE ISN'T EVEN PLAUSIBLE ON ITS FACE.  MAYBE I NEED A BETTER FACT HERE, MAYBE I NEED A FORMER EMPLOYEE, HOW CAN YOU FIX THIS THEORY WHEN THE COMPANY EXCEEDS GUIDANCE, HOW DO YOU FIX THAT THEORY OF FRAUD?

THE COURT:  IT'S INTERESTING, BECAUSE ARGUABLY, I

MEAN LAWYERS ARE EXPENSIVE, BUT THERE'S ACTUALLY AN ARGUMENT THAT HAS ACTUALLY -- THE PROVIDING LEAVE TO AMEND IS A LOWER COST CIRCUMSTANCE HERE BECAUSE WE HAVE THE STAY OF DISCOVERY. IN A TYPICAL CASE, THE PARTIES MIGHT BE IN THE MIDST OF DISCOVERY EVEN THOUGH WE DON'T HAVE A VALID COMPLAINT ON FILE.

MR. KRAMER:  THAT'S TRUE, YOUR HONOR.

THE COURT:  AND YOU WILL PROBABLY SEE I HAVE A VERY LOW BAR, I USUALLY GIVE THE PARTIES AN OPPORTUNITY FOR LEAVE TO AMEND.  IT GOES BOTH WAYS, LAWYERING IS EXPENSIVE BUT THAT APPLIES IN EVERY CASE, AND HERE YOU ARE PROTECTED FROM DISCOVERY FOR AS LONG AS WE ARE IN THIS PROCESS.

MR. KRAMER:  THAT'S FAIR.  I THINK MY ISSUE IS, I CAN'T REMEMBER THE LAST TIME I WAS UP ARGUING A CASE WHERE I WAS ARGUING PLAUSIBILITY AS THE OPENING ARGUMENT, BECAUSE THE WHOLE THEORY, AGAIN, JUST DOESN'T MAKE SENSE.  SO THAT'S WHAT I'M STRUGGLING WITH.

SO OF COURSE WE WILL GO THROUGH THE PROCESS AGAIN IF THAT'S WHAT THE COURT WANTS, BUT I WOULD REALLY LIKE TO SEE HOW COULD THIS WHOLE THEORY CAN BE PLAUSIBLE?  AND IT COULD NOT BE THE THEORY, YOUR HONOR, THAT WHEN YOU EXCEED GUIDANCE THAT YOU SOMEHOW FACE LIABILITY BECAUSE SOMEONE IN THE MARKET WAS HOPING YOU WOULD DO MORE.  STOCK PRICE DECLINES ALL THE TIME.  WE HAVE SEEN IN THE LAST COUPLE OF MONTHS, STOCK PRICES GO DOWN FOR LOTS OF REASONS UNRELATED.  THE PLAINTIFF'S JOB IS TO PLEAD AS YOU SAID IN THE EARLIER CASE, SOME SORT OF FRAUD PREMIUM.  SO

THERE'S NO FRAUD PREMIUM IN THIS CASE BECAUSE WE EXCEEDED IT.
IF THE MARKET EXPECTED MORE --

THE COURT:  AND THE STOCK PRICES RECOVERED, CORRECT?

MR. KRAMER:  OF COURSE, YOUR HONOR, IT'S RECOVERED QUITE A BIT, YOUR HONOR, BECAUSE AT THE END OF THE DAY, THIS IS AN HONEST COMPANY WITH HONEST PEOPLE AND THEY HAVE A REAL BUSINESS, THEY HAVE A REAL BUSINESS.

AND SO I JUST DON'T WANT TO GET IN A SITUATION WHERE I HAVE TO ADVISE COMPANIES, WELL IF YOU GOING TO GIVE GUIDANCE AND IN THE PAST YOU HAVE A RECORD OF EXCEEDING GUIDANCE, YOU MIGHT FACE RISK BECAUSE THE PLAINTIFFS COME IN AND SAY FOR FOUR QUARTERS IN A ROW THEY UNDERPERFORMED GUIDANCE.

THAT'S A STOCKHOLDER RELATION ISSUE, RESPECTFULLY YOUR HONOR, NOT A SECURITIES FRAUD ISSUE, RIGHT.  AND WE ARE HERE ON A SECURITIES FRAUD CASE WHERE WE HAVE A VERY CLEAR STATUTE ON WHAT YOU HAVE TO ALLEGE.  AND THE THEME HERE AND THE WHOLE THEORY OF THE CASE HERE IS JUST NOT PLAUSIBLE, YOUR HONOR.  SO I'M GOING TO STOP.  I'M LOOKING FORWARD TO ANSWER ANY QUESTIONS.

THE COURT:  OKAY.  I WILL GIVE THE PLAINTIFF AN OPPORTUNITY TO RESPOND.

MS. HEIFETZ-LI:  THANK YOU, YOUR HONOR.

SO AS MUCH AS DEFENDANTS WOULD HAVE OTHERWISE, THIS CASE IS NOT ACTUALLY ABOUT NEXTRACKER'S FORECAST OR ITS RESULTS. DEFENDANTS SAID THAT NEXTRACKER WAS NOT BEING AFFECTED BY

INDUSTRY-WIDE HEADWINDS BECAUSE OF THE GROWTH AND BREADTH OF ITS PROJECTS, LET'S CALL THEM INDIVIDUAL TAILWINDS.

THE COURT:  SO IN WHAT SPECIFIC WAY WERE THEY BEING AFFECTED?  WHAT IS THE SPECIFIC REPRESENTATION THAT THEY PURPORTEDLY MADE?

MS. HEIFETZ-LI:  IN PARAGRAPH 99, YOUR HONOR, DEFENDANTS SPECIFICALLY SAY -- I'M SORRY, IT WAS PARAGRAPH 97. ON AUGUST 1ST THEY ADMIT THAT THEY ARE MAKING A BIT OF A SHIFT IN HOW THEY DESCRIBE THE IMPACT OF INDUSTRY-WIDE HEADWINDS TO THE BACKLOG CONVERSION RATE, AND THEY TALK ABOUT HOW PROJECT CYCLES OF MOVING SOMEWHAT TO THE RIGHT.

THE COURT:  OKAY.  AND SO WHAT IS FALSE ABOUT THAT, IN YOUR VIEW?

MS. HEIFETZ-LI:  WELL THAT'S THE ADMISSION, SO THAT'S THE DISCLOSURE OF THE REAL SITUATION.  WHAT THEY PREVIOUSLY SAID IS THAT THE TAILWINDS FROM THE COMPANY, ITS GROWTH THE BREADTH OF ITS PROJECTS AND ITS CLIENTS WERE COUNTERACTING THE INDUSTRY-WIDE HEADWINDS OF PROJECT DELAYS, WHICH YES, OF COURSE EVERYBODY KNEW ABOUT.  ESSENTIALLY THEY PORTRAYED THEMSELVES AS BEING SORT OF RESILIENT AND NOT VOLATILE.

THE COURT:  SO I MEAN, I GUESS -- OKAY.  THERE IS A LOT OF CHARACTERIZATION IN THE BRIEFING, AND I THINK ABOUT -- YOUR VIEW ABOUT WHAT THEY DID.  HERE WE HAVE TO FOCUS ON THE SPECIFIC STATEMENTS ABOUT THE RELATIONSHIP BETWEEN THESE HEADWINDS, AS IT WERE, IN THEIR BUSINESS.  SO WHICH ARE THE

SPECIFIC STATEMENTS THAT IN YOUR VIEW WERE MISREPRESENTATIONS OR MISLEADING?

MS. HEIFETZ-LI:  SO THEY REPEATEDLY SAY, FOR INSTANCE, SO THEY HIGHLIGHT THE COMPANY'S BACKLOG REPEATEDLY, WHICH IS A RETROSPECTIVE METRIC.  THEY REPEATEDLY DENY, AND THIS IS IMPORTANT SPECIFICALLY TO ANALYSTS DURING THE CLASS PERIOD, THAT NEXTRACKER WAS EXPERIENCING ANY ELONGATION IN THE TIMING OF BACKLOG TO REVENUE CONVERSION, AND THEN THEY --

THE COURT:  WHERE IS THE EVIDENCE THAT THEY WERE? AND WHAT IS THE EVIDENCE THAT THEY WERE EXPERIENCING THAT DURING THE TIME PERIOD AT ISSUE?

MS. HEIFETZ-LI:  SO THE EVIDENCE IS REALLY IN THE DEFENDANT'S OWN WORDS.  AND MR. KRAMER TALKS A LOT ABOUT PARAGRAPH 98, THAT THEY ACTUALLY STUCK TO THE FULL YEAR FORECAST WHEN THEY MADE THEIR ADMISSION ON AUGUST 1ST, THAT THEY WERE BEING IMPACTED BY THESE HEADWINDS.  THEY WERE ACHIEVING THE FORECAST -- STICKING TO THE FULL YEAR GUIDANCE, EVEN AS THEY ACKNOWLEDGED THAT THEY WERE BEING IMPACTED BY INDUSTRY-WIDE HEADWINDS WITH RESPECT TO THEIR BACKLOG CONVERSION.

AND THIS IS ACTUALLY A SCIENTER FACT BECAUSE IT SHOWS THAT THE FORECASTER DEFENDANTS ALREADY KNEW AND UNDERSTOOD THE IMPACT OF THESE HEADWINDS WHEN THEY MADE THE FORECASTS, EVEN AS THEY TOLD ANALYSTS IN RESPONSE TO REPEATED DIRECT QUESTIONS THAT NEXTRACKER WAS NOT EXPERIENCING THIS KIND OF ELONGATION.

THE COURT: AND WHEN DID THE -- JUST AGAIN, I'M -- WE NEED TO GET THE FACTS RELEVANT, SO WHEN IS THE STATEMENT THEY ARE NOT EXPERIENCING THIS KIND OF ELONGATION?

MS. HEIFETZ-LI: THERE IS ONE ON, I BELIEVE MAY 14TH. IF YOU WILL EXCUSE ME, I WILL TURN TO THE AMENDED COMPLAINT.

I'M SORRY, SO I -- SO FOR EXAMPLE, ON MAY 14TH DEFENDANT SHUGAR SAYS "ON PRIOR EARNINGS CALLS, WE'VE HAD QUESTIONS REGARDING SECTOR HEADWINDS AND INTERCONNECTION PERMITTING IN OTHER AREAS. WE NOTED THAT THESE HEADWINDS CAN PREVAIL FOR ANY GIVEN PROJECT OR CUSTOMER BUT THAT THE TOTAL UNIVERSE OF PROJECTS AND CUSTOMERS HAS GROWN, SUCH THAT THE TOTALITY OF THE MARKET CONTINUED TO GROW."

THE COURT: SO THEY SAY SOMETHING DIFFERENT ON AUGUST 1ST. WHAT IS THE EVIDENCE THAT THAT WAS NOT TRUE IN MAY WHEN THAT STATEMENT WAS MADE?

MS. HEIFETZ-LI: SO I THINK A BIG FACTOR IS THE TIMING. THIS IS A 79-DAY CLASS PERIOD, AND AFTER MAKING THIS QUALITATIVELY, I AGREE NOT QUANTITATIVELY, BUT QUALITATIVELY DIFFERENT STATEMENT ON AUGUST 1ST THAN THEY DID IN MAY, AND THAT THEY DID AGAIN IN JUNE, YOU KNOW IN SIMILAR SUBSTANCE, THEY DON'T CHANGE THE FORECAST. AND THAT IS EVIDENCE THAT THEY ACTUALLY DID INCORPORATE THE ANTICIPATED NUMBERS THAT THEY KNEW THAT THEY WERE HAVING IMPACT --

THE COURT: THE POINT THEY ARE MAKING IS THAT YOU ARE SORT OF POINTING TO SOME STATEMENTS ABOUT -- THAT ARE MADE. WE

DON'T HAVE SOMEONE SPECIFICALLY SAYING -- NONE OF FORMER EMPLOYEES SAY SPECIFICALLY IN MAY THEY WERE AWARE THAT IT WAS GOING TO BE TWO TO 10 QUARTERS OR TWO TO 12 QUARTERS AS A RESULT OF INCREASE IN DELAYS, OR SOMETHING LIKE THAT.  NO ONE SAYS THAT, AS I UNDERSTAND IT, THERE IS NO ALLEGATION THAT ANYONE SAYS THAT, CORRECT?

MS. HEIFETZ-LI:  CORRECT.  THEY DON'T.  BUT WHAT THEY DO SAY IS THAT THE SENIOR MANAGEMENT OF THE COMPANY, INCLUDING THE INDIVIDUAL DEFENDANTS, VERY CAREFULLY MONITORED DELAYS, THIS WAS A CONSTANT RECORDING.

THE COURT:  RIGHT.  BUT NONE OF THE FORMER EMPLOYEES SAY ANYTHING ABOUT ANY CHANGES IN THOSE PRACTICES THAT EXISTED DURING THIS TIME PERIOD THAT THINGS WERE DIFFERENT IN MAY THAN THEY HAD BEEN IN APRIL OR THEY HAD BEEN THE PRIOR YEAR, THEY MONITORED DELAYS, 20 PERCENT OF PROJECTS ARE DELAYED, IN ONE EMPLOYEE'S VIEW.

IN SOME WAYS THEY ARE ALSO TELLING PEOPLE, WE RECOGNIZE THIS REVENUE OVER TWO TO EIGHT QUARTERS, RIGHT, AND TWO TO FIVE GENERALLY, BUT TWO TO EIGHT GENERALLY, IN SOME WAYS THAT'S TELLING THE MARKET AT THE OUTSET THAT THESE PROJECTS ARE NOT IMMEDIATE, THEY ARE NOT RECOGNIZED IMMEDIATELY.

AND I GUESS THE THING I'M STRUGGLING WITH, IS IT THE BEST, THERE ARE THESE STATEMENTS, THERE'S THESE QUESTIONS ABOUT WHAT EXACTLY IS GOING ON IN THE INDUSTRY AND HOW IT'S AFFECTING THIS COMPANY, BUT ISN'T THE COMPANY'S BEST COMMUNICATION TO THE

MARKET ABOUT HOW ITS DOING ITS GUIDANCE?  AND THEY POINT OUT, THEY SATISFY THAT, THEY EXCEEDED THEIR GUIDANCE, RIGHT, THEY MADE THE GUIDANCE, THEY MET THAT GUIDANCE.  I MEAN, THE THEORY HERE SEEMS TO BE THAT -- THE HARM, THE SHORT TERM STOCK PRICE HIT WAS A RESULT OF THE FACT THAT THEY DID NOT INCREASE THEIR GUIDANCE, THERE WAS AN EXPECTATION THEY WOULD INCREASE IT AND THEY DID NOT DO SO.

BUT HOW IS THAT -- YOU KNOW, THAT THAT WAS A MARKET EXPECTATION, BUT THE COMPANY'S SORT OF CORE THING THEY ARE DOING IS TELLING THE MARKET WHAT THEY ARE EXPECTING, AND THEY SATISFIED THAT.

MS. HEIFETZ-LI:  I AGREE, YOUR HONOR, THAT PROBABLY THE BEST WAY THAT THE COMPANY CAN SPEAK ABOUT ITS EXPECTATIONS IS ITS GUIDANCE, I THINK THE ISSUE IS MORE ABOUT THE QUALITATIVE FACT OF HOW THEY CHANGED, HOW THEY SPOKE ABOUT HOW THESE HEADWINDS WERE IMPACTING THEM, MORE SO THAN THE IMPACT ON THE NUMBERS, BECAUSE IT'S REALLY ABOUT VOLATILITY.  THEY PREVIOUSLY REALLY TOUTED AND SPOKE REPEATEDLY ABOUT THE COMPANY'S RESILIENCE, AND --

THE COURT:  THERE'S ALL THESE FACTS THAT SUGGESTS THE COMPANY WAS RESILIENT.  THEY DON'T INCREASE THEIR GUIDANCE IN ONE QUARTER BUT THEY ULTIMATELY EXCEED THAT GUIDANCE, THEY HAVE A SUCCESSFUL QUARTER AND FISCAL YEAR, CORRECT?

MS. HEIFETZ-LI:  WELL BUT -- THEY DO ULTIMATELY MEET AND EXCEED THEIR GUIDANCE, THAT'S TRUE.  BUT --

THE COURT:  AND HERE AGAIN, THIS SORT OF GENERAL DISCUSSION OF OPINIONS ABOUT HOW THEY RELATE TO THESE HEADWINDS, WHAT WE NEED, IT SEEMS LIKE FOR A FRAUD CASE YOU NEED THIS SPECIFIC STATEMENT WAS FALSE OR MISLEADING WHETHER ON ITS FACE OR BY OMISSION.  AND I AM STILL HAVING TROUBLE SEEING WHAT IS SPECIFIC ENOUGH HERE TO BE FALSE OR MISLEADING IN LIGHT OF WHAT IS ALLEGED ABOUT WHAT SPECIFICALLY WAS GOING ON.

MS. HEIFETZ-LI:  WELL I THINK THE ISSUE HERE IS THAT THE STOCK PRICE FELL BECAUSE THE ANALYSTS THAT WERE COVERING THE COMPANY CHANGED THEIR TARGETS FOR THE STOCK PRICE.  AND THE REASON FOR THE HIGHER PRIOR TARGET, IT WAS THOSE BALANCING TAILWINDS THAT SO MANY ANALYSTS TALKED ABOUT IN THEIR REPORTS AND IN COMMENTARY ABOUT THE COMPANY, THEY ASKED THE COMPANY ABOUT IT, BECAUSE THEY MADE THE COMPANY LESS VOLATILE THAN OTHER COMPANIES IN THE SAME SECTOR, AND VOLATILITY MATTERS.

JUDGE POSNER WROTE IN TELLABS ON REMAND, "INVESTORS DON'T LIKE TO THINK THEY ARE RIDING A ROLLER COASTER, AND VOLATILITY IN GENERAL RESULTS IN LOWER STOCK PRICES."

SO DEFENDANTS CREATED A FALSE NARRATIVE THAT NEXTRACKER WASN'T VOLATILE BECAUSE OF THE GROWTH AND THE BREADTH OF ITS PROJECTS, IT WAS RESISTANT UNIQUELY TO THESE INDUSTRY-WIDE DELAYS, IN TERMS OF IMPACT, NOT THAT THEY WEREN'T HAPPENING BUT THAT THERE WERE OTHER GOOD THINGS HAPPENING AT THE COMPANY THAT OUTWEIGHED THEM, AND THAT FALSE NARRATIVE --

THE COURT:  I THINK YOU SAID IN AUGUST THEY SAY THAT

THE IMPACT HAS BEEN A SLIGHT -- AN INCREASE TWO TO 10 INSTEAD OF TWO TO EIGHT IN THE RECOGNITION OF REVENUE, CORRECT?

MS. HEIFETZ-LI:  YES.  THEY ALSO MENTION THAT ONLY 80 PERCENT OF THE BACKLOG IS EXPECTED TO BE REALIZED.

THE COURT:  MAYBE THAT'S WHAT I'M THINKING.  MAYBE ONLY 80 PERCENT WILL MEET THIS TWO TO EIGHT TERM.

MS. HEIFETZ-LI:  AND ALSO THEY SPECIFICALLY SAY THAT THIS IS A SHIFT IN HOW THEY ARE TALKING ABOUT THIS.

THE COURT:  RIGHT.  BUT AGAIN, WHAT IS -- WHAT ABOUT THAT IS SHOWING THAT IT'S FALSE WHEN THEY SAY THAT THE SIZE OF THEIR BACKLOG WHICH IS A MEASURE OF EXPECTED REVENUE DOES PROVIDE THEM WITH SOME DEGREE OF PROTECTION IF THEY HAVE ENTERED INTO CONTRACTS TO PERFORM WORK OVER THE NEXT TWO TO EIGHT QUARTERS?  VOLATILITY, I DON'T KNOW, IS ALMOST LIKE -- WHAT IS THE MEASURE OF VOLATILITY THAT THEY MISREPRESENTED IN THE EARLIER PHASE THAT THEY ARE NOW REPRESENTING HERE?  IT SEEMS LIKE YOU NEED TO POINT TO THAT, NOT JUST THE GENERAL SENSE THAT INVESTORS THOUGHT THEY WERE -- THE BUSINESS WOULD NEVER BE AFFECTED BY ANYTHING HAPPENING IN THE MARKET.  BECAUSE THAT WOULD AN UNREASONABLE MARKET EXPECTATION, RIGHT?  AND I DON'T THINK THEY EVER REPRESENTED THAT, THEY REPRESENTED THAT THEY HAD SOME PROTECTION, GIVEN THE EXTENT OF THEIR BACKLOG.

MS. HEIFETZ-LI:  WELL THEY SAID, FOR EXAMPLE ON JUNE 17TH, DEFENDANT BOYNTON SAID THAT NEXTRACKER HAD BEEN RESILIENT BECAUSE OF THE SIZE AND SCALE AND ABILITY TO MEET ITS

CUSTOMERS' DEMANDS.

THE COURT:  AND I DON'T KNOW THAT THE CHANGE THEY IDENTIFIED, THE SHIFT IN 80 PERCENT, RESULTED IN TWO TO EIGHT. IT'S NOT NECESSARILY INCONSISTENT WITH BEING RESILIENT.

MS. HEIFETZ-LI:  NO, I THINK THAT --

THE COURT:  I MEAN, THAT'S THE PROBLEM.  LIKE RESILIENT, THESE ARE SORT OF TERMS THAT DON'T -- I'M NOT SURE THEY HAVE THE DEGREE OF SPECIFICITY NECESSARY TO SUPPORT A CLAIM.

MS. HEIFETZ-LI:  I THINK THE ISSUE IS IT'S REALLY THE FIRST TIME THEY ARE ACKNOWLEDGING THAT THE BACKLOG CONVERSION IS REALLY BEING IMPACTED AT ALL.

PREVIOUSLY THEY TALKED ABOUT HOW THEY COULD PUSH ANOTHER PROJECT IF ANOTHER PROJECT WAS DELAYED, THINGS LIKE THAT, WHICH DOESN'T ACTUALLY ENTIRELY MAKE SENSE BECAUSE THEY DON'T HAVE CONTROL OVER PROJECT TIMELINES.  BUT REGARDLESS, IT'S THE FIRST ACKNOWLEDGEMENT THAT THEIR TOTAL REVENUE CYCLES ARE GETTING LONGER, WHEREAS PREVIOUSLY THEY HAD ALWAYS TALKED ABOUT THAT THEY COULD MAKE UP FOR DELAYS IN OTHER AREAS.

THE COURT:  AND THAT, YOU KNOW, THAT CHANGE MAY HAVE HAPPENED.  I MEAN AGAIN, THERE IS A LITTLE BIT OF A SENSE HERE OF, LIKE, THE THEORY BEING THE COMPANY IS FAR TOO HONEST, THAT THEY --

MR. KRAMER:  THANK YOU FOR THAT, YOUR HONOR.

THE COURT:  THAT THEY MET THEIR GUIDANCE IN AUGUST,

THEY ACKNOWLEDGE THIS CHANGE THAT HAPPENS -- AND I'M NOT SEEING -- AGAIN, I NEED EVIDENCE THAT WHAT THEY SAID BEFORE WAS FALSE AND THAT THEY KNEW IT WAS FALSE, RIGHT.  I MEAN, THAT'S THE STANDARD UNDER THE PSLRA.  AND WHERE IS THAT?  I'M STILL HAVING TROUBLE IDENTIFYING THAT, TO BE PERFECTLY FRANK.

MS. HEIFETZ-LI:  THIS IS A 79-DAY CLASS PERIOD, YOUR HONOR, SO I THINK -- IT'S A LITTLE DIFFICULT, I THINK, TO DRAW AN INFERENCE THAT THIS IS SOMETHING NEW THAT HAPPENS JUST IN THAT VERY SHORT TIME PERIOD, OR MAYBE BETWEEN THE SIX WEEKS BETWEEN THE LAST STATEMENT TO THE EFFECT AND AUGUST 1ST.

THE COURT:  I MEAN, IT'S ALSO -- MAYBE IT'S BECAUSE IT'S THE KIND OF CLAIM, THE SHORTNESS OF THE CLASS PERIOD HAS SOMETHING TO DO WITH THE FACT THAT THE KIND OF CLAIM THAT'S ATTEMPTING TO BE PURSUED, PREMISED NOT ON THE FALSITIES AND THE GUIDANCE, BUT THERE'S SORT OF A COUPLE OF STATEMENTS AND TRYING TO COMMUNICATE VERY FRANKLY IN SOME WAYS WITH THE MARKET ABOUT WHERE THINGS STAND.

MS. HEIFETZ-LI:  WELL I THINK THE ISSUE THOUGH IS THAT THEY STILL -- YOU KNOW, I THINK WE STILL NEED TO LOOK AT THE FACT THAT THEY DON'T -- EVEN AS THE FIRST TIME THAT THEY ACKNOWLEDGE THAT THEY ARE BEING IMPACTED BY THESE HEADWINDS, THEY CLEARLY HAVE DEVELOPED FORECASTS THAT INCORPORATE THAT. SO IT MAY BE THAT --

THE COURT:  WE DON'T HAVE ANY FORMER EMPLOYEE SAYING THAT THEY -- THAT THE GUIDANCE WAS BASED ON AN INTERIM, I WAS

AT THE DISCUSSION WHERE THEY TALKED ABOUT THESE HEADWINDS AND ACKNOWLEDGED THAT THEY WERE SUBSTANTIALLY IMPACTING BUSINESS AND THEY WERE GOING TO INCORPORATE IT INTO THIS FISCAL YEAR GUIDANCE, CORRECT?  WE DON'T HAVE THAT.

MS. HEIFETZ-LI:  NO, WE HAVE -- NO, WE DON'T.

THE COURT:  OKAY.

MS. HEIFETZ-LI:  BUT I THINK THAT THE COMBINATION OF THE IMPORTANCE OF THE BACKLOG AS A METRIC WITH THE TEMPORAL PROXIMITY OF THE DENIALS, YOU KNOW, I THINK THAT REALLY RAISES AN INFERENCE OF FRAUDULENT INTENT BECAUSE SIX WEEKS LATER, SUDDENLY THE STORY HAS CHANGED.  AND INSTEAD OF FOCUSING --

THE COURT:  BUT AGAIN, THE STORY HAS CHANGED BY SAYING, YOU KNOW, ONLY 80 PERCENT OF OUR PROJECTS ARE GOING TO MEET THE TWO TO EIGHT QUARTER GOAL, CORRECT?

MS. HEIFETZ-LI:  QUANTITATIVELY, YES.  BUT QUALITATIVELY, I THINK THERE'S A REAL SHIFT IN HOW THEY TALK ABOUT HOW THEY ARE BEING IMPACTED.  THERE IS NO LONGER THE FOCUS ON THE BREADTH OF THE CUSTOMER BASE AND HOW THEY CAN MAKE UP FOR THESE THINGS.

THE COURT:  ALL RIGHT.  ANYTHING ELSE YOU WOULD LIKE TO OFFER ON THE MOTION?

MS. HEIFETZ-LI:  I CAN SPEAK ABOUT SOME OF THE MATERIALITY, FOR INSTANCE, OR THE FALSITY OF THE RISK DISCLOSURES -- AND ALSO THE FACT THAT THEY WERE SPEAKING DIRECTLY TO ANALYSTS, IF THE COURT WOULD LIKE TO HEAR ON THAT.

THE COURT:  I MEAN, I THINK I'VE HAD A CHANCE TO REVIEW THE BRIEFING, SO IF THERE'S ANYTHING ELSE YOU WOULD LIKE TO -- SPECIFICALLY YOU WOULD LIKE TO ARGUE, PARTICULARLY IN RESPONSE TO WHAT YOUR COLLEAGUE SAID?

MS. HEIFETZ-LI:  I THINK I WOULD JUST EMPHASIZE THAT THE FRAUD ISN'T ABOUT THE FORECAST OR THE RESULTS, IT'S ABOUT THE FACT THAT THE INVESTORS WERE SPECIFICALLY INTERESTED IN HEADWINDS.  THE ANALYSTS ASKED ABOUT THEM REPEATEDLY AND INSTITUTIONAL INVESTORS HAVE A PRICE TARGET AND WHEN THEY HIT THE PRICE TARGET, THEY ARE GOING TO INVEST SOMEWHERE ELSE, AND THAT'S WHAT HAPPENED WHEN ANALYSTS LEARNED ABOUT THIS RISK OF BEING IMPACTED BY THE HEADWINDS MATERIALIZING, THEY CHANGED THEIR PRICE TARGET.

AND THEY ADJUSTED THE PRICE TARGET BECAUSE OF SOMETHING DEFENDANTS TOLD INVESTORS MIGHT ONLY THEORETICALLY IMPACT THEM. YOU KNOW, DENIED THAT IT WAS ALREADY CONTEMPORANEOUSLY IMPACTING THEM, BUT THEN ON AUGUST 1ST, AFTER A SHORT PERIOD OF TIME, THEY SAID IT DID IMPACT THEM.  SO I THINK THAT'S SQUARELY WITHIN THE ALPHABET FRAMEWORK.

I THINK IT'S IMPORTANT TO LOOK AT THE ANALYSIS IN AVAYA, WHICH ALSO TALKS A LOT ABOUT THE TEMPORAL PROXIMITY.  AND DEFENDANTS TALK IN THEIR BRIEFING ABOUT HOW THIS IS I THINK EGREGIOUSLY FALSE IN COMPARISON TO AVAYA AND THEN THEY USE AVAYA'S FALSITY ANALYSIS TO MAKE THAT POINT.  BUT THIS CASE ISN'T LIKE AVAYA BECAUSE OF FALSITY, IT'S LIKE SCIENTER.  IN

AVAYA, THE THIRD CIRCUIT HELD THAT A COMPLAINT SUFFICIENTLY

LEAD TO SCIENTER BY PLEADING THAT EXECUTIVES DENIED MATERIAL

PROBLEMS IN CLOSE PROXIMITY TO THEIR EVENTUAL DISCLOSURE, AND

THAT IS ESSENTIALLY THE SAME FACT PATTERN THAT WE HAVE HERE,

ALONG WITH ANALYSTS SPECIFICALLY ASKING DEFENDANTS ABOUT THESE

ISSUES.

THE COURT:  I MEAN THE PROBLEM IS IDENTIFYING WHERE

THEY DENIED THE PROBLEMS, RIGHT?  THEY WERE ASKED ABOUT IT,

THEY SAID WE HAVE A BELIEF THAT THERE'S SOME RESILIENCY BASED

ON OUR BACKLOG.  THAT THERE'S NO -- I DIDN'T SEE ANY

REPRESENTATION THAT THESE HEADWINDS DIDN'T EXIST AS TO A

COMPANY, CORRECT?

MS. HEIFETZ-LI:  THEY DON'T DENY THE HEADWINDS EXIST

FOR THE ENTIRE INDUSTRY, AND OF COURSE ON THEM AS WELL, WHAT

THEY DENY IS THEY ARE BEING IMPACTED THE SAME WAY AS THEIR

COMPETITORS.

THE COURT:  I DON'T SEE AN ALLEGATION ABOUT WHAT WAS

REVEALED IN AUGUST WAS IDENTICAL, IT COULD VERY WELL BE THAT

THE COMPETITORS WERE DOWN, HAD A FOUR TIMES CHANGE IN THEIR

PRACTICES, SO IN FACT THE AUGUST REVELATION COULD BE ENTIRELY

CONSISTENT WITH THEIR RESILIENCY, COULDN'T IT BE?

MS. HEIFETZ-LI:  I THINK IT'S DIFFERENT FROM WHAT

THEY SAID BEFORE, THAT THEY HAD THIS RESILIENCY, AND THAT NOW

WE ARE ADMITTING THAT THEY DON'T HAVE THIS RESILIENCY.

THE COURT:  WE ARE ADMITTING THAT THERE'S BEEN SOME

IMPACT, A RESILIENCY DOESN'T -- RESILIENCY IS NOT -- DOESN'T --

I DON'T KNOW THAT I READ RESILIENCY -- IT'S HARD TO SAY THAT

FOR PURPOSES OF FALSITY THAT THAT IS A REPRESENTATION OF ZERO

IMPACT, RIGHT?  THAT'S NOT NECESSARILY THE DEFINITION OF

RESILIENCY, IT COULD BE THE ABILITY TO BOUNCE BACK, WHICH

ARGUABLY THEY WOULD REPRESENT IS HOW BUSINESS IS PERFORMED.

MS. HEIFETZ-LI:  PERHAPS, BUT I THINK THAT IN THIS

INSTANCE IT'S REALLY THE FIRST ACKNOWLEDGEMENT THAT THESE

TAILWINDS THAT THEY TOUT REPEATEDLY REALLY AREN'T ENOUGH TO

OFFSET THE HEADWINDS THAT ARE HAPPENING AS WELL.

THE COURT:  OKAY.  THANK YOU.

MS. HEIFETZ-LI:  AND JUST ONE LAST THING YOUR HONOR,

I WOULD JUST ASK TO GO BACK TO A TOPIC MR. KRAMER RAISED AS

WELL THAT IF YOUR HONOR DOESN'T BELIEVE THIS COMPLAINT IS

SUFFICIENT, WE WOULD LIKE THE OPPORTUNITY TO AMEND THE

COMPLAINT AS WELL.

THE COURT:  I SAW THAT, AND AS I SAID, I AM PRETTY

GENEROUS WHEN IT COMES TO LEAVE TO AMEND FOLLOWING AN ORDER ON

A MOTION TO DISMISS.  EVEN IF THE CIRCUMSTANCES WHERE THERE

HAVE BEEN A FEW PRIOR COMPLAINTS.  THIS IS THE FIRST

POST-DESIGNATION COMPLAINT, BUT THANK YOU.

MS. HEIFETZ-LI:  THANK YOU, YOUR HONOR.

MR. KRAMER:  YOUR HONOR, MAY I MAKE FOUR QUICK

POINTS?

FIRST, THE BUSINESS DID CHANGE.  REMEMBER, BACKLOG

CONVERTING TO REVENUE IS BECAUSE OF FACTORS OUTSIDE OF OUR CONTROL.  AND THE PARAGRAPH 97 ALLEGATION, WHEN MR. WANGER IS ASKED, "WAS THIS A CHANGE?"  HE SAID "YES, IT IS A BIT OF A SHIFT."

SO SECURITIES FRAUD IS NOT ABOUT A COMPANY BEING HONEST ABOUT WHAT'S CHANGING IN THE MARKET, IT'S ABOUT DID YOU LIE ORIGINALLY?  AND THERE'S NO ALLEGATIONS, AS THE COURT POINTED OUT, THAT THERE WAS ANY FALSE STATEMENT ABOUT THE IMPACT ON BACKLOG, THE IMPACT ON TIMING OF CONVERSION OF BACKLOG TO REVENUE IN THE GUIDANCE OR ANY OTHER FACTS ALLEGED.

AND I JUST WANT TO POINT OUT A COUPLE OTHER THINGS.  ON THE STATEMENT TWO TO EIGHT QUARTERS, THAT STATEMENT WHICH IS MADE DURING THE EARNINGS CALL DURING THE CLASS PERIOD, THAT'S PROTECTED BY THE SAFE HARBOR, YOUR HONOR.  THE QUESTION THAT'S BEING ASKED IS WHAT'S YOUR FORECAST AND THAT'S THE ANSWER THAT'S GIVEN.  AND UNDER INTEL AND INTUITIVE SURGICAL, THAT'S FORWARD LOOKING.  AT THE BEGINNING OF THAT CALL, ALL THE RISK FACTORS ARE LAID OUT, SO IT'S PROTECTED BY THE PSLRA.

AND I WOULD JUST POINT OUT THAT PLAINTIFFS DID NOT EVEN RESPOND TO THAT ARGUMENT IN THEIR OPPOSITION BRIEF, YOUR HONOR.

IN ADDITION, YOUR HONOR, I WOULD SAY IT'S INTERESTING, ARGUMENT THAT COUNSEL MADE WAS THE STOCK PRICE FELL BECAUSE ANALYSTS LOWERED THE TARGET.

SECURITIES FRAUD IS ABOUT THE STOCK PRICE FALLING BECAUSE THE COMPANY LIED, RIGHT?  WE OBVIOUSLY DON'T CONTROL WHAT

ANALYSTS THINK OR MIGHT EXPECT OR WHAT THEY MODEL.  AND IF YOU LOOK AT THE ALLEGATIONS IN THE COMPLAINT, THERE IS NOTHING ABOUT THE STOCK PRICE, THE ANALYSTS LOWERING THEIR TARGET BECAUSE THEY THOUGHT THE COMPANY WAS DISHONEST OR LIED OR MISREPRESENTED.  IT'S JUST NOT THERE.

AND THE FINAL THING, YOUR HONOR, THE FACT THAT YOUR HONOR HAS READ THE PAPERS, YOU'VE MET WITH YOUR CLERKS, YOU TALKED ABOUT THIS, YOU ARE OBVIOUSLY WELL-PREPARED, AND STILL IN THE MIDDLE OF THE HEARING YOU ARE HAVING A HARD TIME UNDERSTANDING THE THEORY AND UNDERSTANDING WHERE THE ALLEGATIONS OF FALSITY AND SCIENTER ARE, THAT'S REALLY THE END OF THE DAY, YOUR HONOR. THE PLAINTIFFS HAVE A BURDEN OF ALLEGING SPECIFIC FACTS AND ARTICULATING A CLEAR THEORY OF FRAUD AND ALLEGING FACTS THAT CREATE A STRONG INTEREST OF SCIENTER.  THE FACT WE ARE STILL HUNG UP ON A THEORY, I THINK SPEAKS VOLUMES.

SO YOUR HONOR, WE FEEL VERY STRONGLY THIS COMPLAINT SHOULD BE DISMISSED.  PLAINTIFFS SHOULD NOT BE ABLE TO BRING A COMPLAINT WHERE A COMPANY MEETS OR EXCEEDS ITS GUIDANCE SIMPLY BECAUSE ANALYSTS, FOR WHATEVER REASON, WERE EXPECTING MORE. AND FOR THAT REASON, YOUR HONOR, WE THINK THE CASE SHOULD BE DISMISSED.

THE COURT:  THANK YOU.  I WILL TAKE THE MOTION UNDER SUBMISSION AND AIM TO GET A DECISION OUT FORTHWITH.

(PROCEEDINGS CONCLUDED AT 11:22 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____

SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

DATED:  DECEMBER 12, 2025

UNITED STATES COURT REPORTERS